


A Method for Careful Study: A Proposal for Reforming the Child Pornography Guidelines
Author(s): Troy Stabenow
Reviewed work(s):
Source: *Federal Sentencing Reporter*, Vol. 24, No. 2, Federal Child Pornography Sentencing (December 2011), pp. 108–136
Published by: University of California Press on behalf of the Vera Institute of Justice
Stable URL: http://www.jstor.org/stable/10.1525/fsr.2011.24.2.108
Accessed: 27/01/2012 12:15

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at
http://www.jstor.org/page/info/about/policies/terms.jsp

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of
content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms
of scholarship. For more information about JSTOR, please contact support@jstor.org.

*University of California Press* and *Vera Institute of Justice* are collaborating with JSTOR to digitize, preserve
and extend access to *Federal Sentencing Reporter.*



http://www.jstor.org

Electronic copy available at: http://ssrn.com/abstract=1996664

# A Method for Careful Study: A Proposal for Reforming the Child Pornography Guidelines



**TROY STABENOW**[*]

Assistant Federal
Public Defender,
Western District
of Missouri

## I. Introduction

In 2008, I authored an article questioning the empirical basis underpinning U.S. Sentencing Guideline § 2G2.2 and the severity of sentences it imposed on those who possessed, received, or distributed child pornography.[1] Despite initial ad hominem attacks,[2] the article succeeded in opening a dialogue about the validity of § 2G2.2.[3] The purpose of this article is to assess the current situation, and then shift the conversation to a discussion of how to fix the guideline going forward so that credibility can be restored to the system.

The U.S. Sentencing Commission is reportedly nearing release of a much-anticipated report to Congress assessing the validity of § 2G2.2 as a sentencing tool.[4] Although neither the Sentencing Commission nor the Department of Justice (DOJ) has floated any specific models for how § 2G2.2 might change, the DOJ has acknowledged that "the report to Congress ought to recommend legislation that permits the Sentencing Commission to revise the sentencing guidelines for child pornography offenses and that suggests what any revised guidelines might look like."[5] A consensus for *considering* reform exists. What remains uncertain is what sort of changes might be coming, and by what process they may occur.

The Commission's ability to convince Congress to allow meaningful corrections to § 2G2.2 is uncertain. In order to merit deference and compliance, any changes to § 2G2.2 would need to reflect relevant and validated scientific data yet also account for common practical experiences. It is hoped that reforms would incorporate input and debate from a spectrum of sources about the necessity and utility of each proposed offense level and enhancement. The nature of these offenses, however, leads to high emotions and renders any discussion extremely susceptible to the impact of public hysteria and political opportunism.[6]

In this article, I propose a specific framework for how the Sentencing Commission might reform § 2G2.2 to better reflect science and common experience. The proposal draws on my experiences prosecuting,[7] defending,[8] and consulting on these cases over the last twelve years, as well as analysis and discussion of available scientific studies and statistics. Although much of this article is backed by citable sources, some is not. I intentionally chose to include information from my own experiences, as well as those of hundreds of other attorneys, because the potential criticism of this data is outweighed by the importance of conveying the practical realities to policymakers in Congress and the Commission.[9]

This article is not designed to serve the interests of the defense bar, and should not be read as representative of the opinion of the Federal Defender community. Although several of my proposals will likely prove popular with defense attorneys, others will not. This article simply represents one seasoned practitioner's proposal for how less serious offenders might be better differentiated from the more pernicious and dangerous ones.

In this article, I propose both the elimination of several existing enhancements and the creation of several specific new ones. I also propose a complete overhaul of the base offense levels. If adopted, these suggestions would tend to lower sentences for generic offenders, but would also result in dependably higher sentences for those who either pose the greatest risks to society or bear the greatest moral culpability.

I hope these proposals will spark debate and lead to a more reflective and empirically based guideline. It is my intent that by designing a structure more worthy of deference, greater predictability can be restored to the sentencing process while ensuring rational treatment for all offenders. A more rational system for identifying and differentiating offenders will lead to greater judicial respect for, and adherence to, the guideline. Ultimately, I hope that our leaders in Congress, who would need to authorize any changes, will see the merits of allowing reform. Greater uniformity, and revised punishment as outlined here, would certainly allow our leaders to publicly endorse the measure as one that provides more consistently high punishments for the worst offenders while saving expense on those offenders not likely to reoffend. Such a system should be more palatable than the status quo.

## II. The Status Quo

### A. District Court Dissatisfaction Is Growing

In early 2010, the United States Sentencing Commission surveyed federal judges about the state of the federal

*Federal Sentencing Reporter*, Vol. 24, No. 2, pp. 108–136, ISSN 1053-9867 electronic ISSN 1533-8363.
©2011 Vera Institute of Justice. All rights reserved. Please direct requests for permission to photocopy
or reproduce article content through the University of California Press's Rights and Permissions website,
http://www.ucpressjournals.com/reprintInfo.asp. DOI: 10.1525/fsr.2011.24.2.108.

guidelines sentencing system.[10] For crime after crime, the majority of judges agreed that the guidelines *generally* render appropriate sentences.[11] For instance, 83% of judges believed the assault guidelines are generally appropriate, whereas 85% of judges believed the child pornography *production* guidelines (§ 2G2.1) are generally appropriate or even lenient.[12] More controversial societal issues generated somewhat higher dissatisfaction levels, with 34% of federal judges expressing a feeling that the Guidelines generally produce too harsh a sentence for illegal reentry defendants, and 41% expressing that feeling for marijuana offenses.[13] There were only three crimes for which more than 41% of federal judges expressed the conviction that the Guidelines generally produce too harsh a sentence.[14] For those three particular crimes, the dissatisfaction rate was surprisingly high and virtually identical: 70% for possession of crack cocaine, 70% for possession of child pornography, and 69% for receipt of child pornography.[15]

The fact that judicial dissatisfaction with certain parts of the child pornography guidelines[16] reached the same level as dissatisfaction over the crack-cocaine guidelines is striking because of the timing of this survey. This judicial survey occurred at a time when the Sentencing Commission had partially adjusted the crack-cocaine guideline downward,[17] but everyone was waiting for Congress's authorization to end the 100-to-1 crack cocaine–to–powder cocaine ratio. The United States Senate, at the Commission's recommendation, had just *unanimously* approved the bipartisan Fair Sentencing Act of 2010, designed to further "restore fairness to federal sentencing" by further lessening the punishments for crack cocaine, but the act was not yet law.[18] In addition, federal judges had spent three years digesting the Supreme Court's conclusion that the crack-cocaine guidelines

> do not exemplify the Commission's exercise of its characteristic institutional role. Given the Commission's departure from its empirical approach in formulating the crack Guidelines and its subsequent criticism of the crack/powder disparity, it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence "greater than necessary" to achieve § 3553(a)'s purposes, even in a mine-run case.[19]

In other words, crack-cocaine sentencing was being publicly pilloried and unanimously rejected by both major political parties, neutral scientists, the Supreme Court, and the U.S. Sentencing Commission as being both scientifically invalid and ethically unjust.[20] That federal judges expressed similar concerns over the way the Guidelines treat people who possess and receive child pornography is a significant statement.

District courts continue to express their disapproval of § 2G2.2's provisions via their sentencing decisions and written opinions.[21] During fiscal year 2010, 58% of § 2G2.2 defendants (991 of 1,708, a number that *included* distribu-

tors) received sentences *below* the Guideline range.[22] Furthermore, courts gave "pure" variances to below-guideline sentences in 38.9% of cases (664 of 1,708).[23] Through the first three quarters of 2011, the rate is even higher, with 62.2% of defendants receiving a below-guideline sentence (859 of 1,380).[24]

To appreciate the significance of these statistics, compare § 2G2.2 to another set of common federal crimes. For example, during FY 2010, defendants who conspired or attempted to possess drugs (§ 2D2.1) received below-guideline sentences in only 5% of cases, with a variance rate of just 1.9% (4 of 213 cases).[25] For drug possession cases more generally, judges downward departed or varied just 3.8% of the time (28 of 746).[26]

The fact that judges are varying so much in one particular type of case is not indicative of a "regime" of judges who impose sentences "inconsistently and without regard to the federal sentencing guidelines" process.[27] Instead, evaluate these actions by the premise, authored by the Sentencing Commission, that departures and variances are

> considered an important mechanism by which the Commission could receive and consider feedback from courts regarding the operation of the guidelines. The Commission envisioned that such feedback from the courts would enhance its ability to fulfill its ongoing statutory responsibility under the Sentencing Reform Act to periodically review and revise the guidelines [under 28 U.S.C. § 994(o)].[28]

If viewed in this way, the actions of the courts are bound in precedent and represent an important corrective mechanism for the system.

Furthermore, the Commission has encouraged and used this type of feedback cycle before. When the Firearms and Explosive Materials Working Group noticed an 8.4% upward departure rate—compared with an overall rate of 3.5%—in firearms cases in the late 1980s, the Sentencing Commission convened a working group that studied the issue and then recommended changes to the firearms guidelines designed to address the experience of national judges.[29] Those recommendations ultimately resulted in higher guidelines for firearms cases and longer sentences for defendants.[30] Now, as the departure and variance rate for § 2G2.2 reaches a historic high (62%), the district courts are again fulfilling one of their anticipated functions: providing feedback about a guideline that does not provide reasonable and appropriate sentences for most defendants.

It is important to understand that the departure-variance rate is also not indicative of judges going soft on child pornography. For FY 2010, the average sentence for all child pornography offenses (120.1 months) was higher than the average sentence for the commission of contact sexual abuse (113.8 months), manslaughter (73.5 months), robbery (80.8 months) or arson (78.2 months).[31] In fact, a criminal history category I defendant who committed a child pornography offense could expect to receive a higher

sentence (109.6 months) than a criminal history category *VI* offender who continued a long life of crime by committing yet another robbery (88.9 months), arson (102.3 months), or felonious assault (70.8 months).[32]

### B. Appellate Courts Agree with the District Courts

Appellate courts, reviewing the reasons these district courts varied, have come to the conclusion that § 2G2.2 fails to provide district courts sufficiently meaningful guidance at sentencing.[33] In upholding a below-guidelines sentence, the Third Circuit observed that "the Commission probably did the best it could under difficult circumstances, but to say that the final product is the result of Commission data, study, and expertise simply ignores the facts."[34] The Second Circuit went further, reversing a bottom-of-the-guideline sentence as substantively unreasonable and "manifestly unjust."[35] In so doing, the Second Circuit engaged in a detailed review of the history of § 2G2.2 and took careful consideration of the Commission's report to Congress, warning that "the frequent mandatory minimum legislation and specific directives to the Commission to amend the guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress."[36] The Second Circuit ultimately concluded that the guideline is beset with "irrationality" to such a degree that "unless applied with great care, [it] can lead to unreasonable sentences that are inconsistent with what 3553 requires."[37] The court even went so far as to specifically advise its courts as follows:

> District judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under § 2G2.2—ones that can range from noncustodial sentences to the statutory maximum—bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results.[38]

Numerous cases have upheld the district court's discretion to implement a guideline sentence while simultaneously deriding the guideline itself.[39] For example, while upholding a district court's right to impose a § 2G2.2 guideline sentence, the Seventh Circuit observed that "perhaps for good reason, the government did not take issue with Huffstatler's premise that the child-exploitation guidelines lack an empirical basis."[40] In another case where the defendant challenged only the length of his supervised release, the Ninth Circuit chose to add a section warning of the flaws of 2G2.2.[41]

In sum, a growing appellate consensus identifies § 2G2.2 as a particularly problematic guideline.

### C. The Stacking Problem

Not a week has gone by during the last three years in which I haven't received at least one call from a defense attorney (or military prosecutor) wanting to discuss a child pornography case. During that time, I have also spoken to legal audiences throughout the United States on dozens of occasions. Whether the defendant is charged with possession, receipt, or distribution, the practitioners I encounter all want to discuss a common set of sentencing variables, consistent with my own experience and confirmed by published sentencing data. Of the 1,711 § 2G2.2 defendants sentenced nationwide in fiscal year 2010,[42] 96.6% received a number of images enhancement, 96.2% received an enhancement for use of a computer, 95.6% received an enhancement for at least one image of a person under 12, and 73.7% involved an enhancement for possession of at least one image of sadistic or masochistic conduct.[43] In other words, almost every case involves certain similar sentencing variables; these variables do not tend to differentiate offenders. Instead, these enhancements skew and concentrate almost all "offenders at the top of the spectrum" in a manner "fundamentally incompatible with § 3553(a)."[44]

District courts have engaged on this issue. In New Jersey, for example, one district court held hearings to determine how these particular enhancements operate in practice. That court found the following:

> As persuasive as Stabenow and Professor Berman were on this point, ultimately the most persuasive evidence came from the government's own witness. SA Chase is the veteran of 100,000 images from 180 collections. In her testimony, SA Chase recognized that *every one* of her 180 investigations involved a possessor with 600 or more images. (SA Chase Test., Dec. 1, 2008, 81:21–25.) SA Chase testified that *every one* of the cases she had worked on—"100 percent"— "involved the use of a computer and of interactive computer service." (SA Chase Test., Dec. 1, 2008, 80:21–25.) Further, according to SA Chase, "all" of the cases she has worked on involved images of prepubescent minors under age 12, either posing or engaged in sexual activity. (SA Chase Test., Dec. 1, 2008, 82:16-17.) Even a vast majority—"80 percent"—had at least one image and video depicting sadomasochistic content. (SA Chase Test., Dec. 1, 2008, 82:23–24.) SA Chase's experience on the ground punctuates Stabenow's and Berman's view that the purportedly aggravating factors are actually inherent in the possession of child pornography.[45]

At this point, the example of simple possession may be helpful to demonstrate how these enhancements skew sentences upward and clump offenders together. Assume a pool of first-time defendants with no criminal history who each possessed some amount of child pornography. The base offense level for possession under § 2G2.2 is 18.[46] Greater than 95% of offenders use a computer (plus 2)[47], have at least one picture of a person under 12 (plus 2)[48], and have at least ten pictures (plus 2)[49]—so approximately 95% of these offenders will start with an offense level of 24. Even if they all plead guilty and receive full credit for acceptance, this situation corresponds to a guideline range of 37–46 months.

With a five-second video counting as seventy-five images, most defendants receive a higher enhancement for number of images.[50] In fact, 84.6% of defendants receive 3 levels (150–300 images), 76.3% receive 4 levels (300–600), and 66.9% receive a 5-level enhancement (600-plus pictures).[51] This calculation correlates to offense levels, after acceptance, of 41–51, 46–57, and 51–63 months.

On top of that, 73.7% of defendants have at least one picture that counts as sadistic (plus 4),[52] a category broadened by case law to include any sexual contact between an adult and a prepubescent minor, regardless of whether the sexual act involves overt pain or cruelty.[53] Assuming that this enhancement also corresponds predominantly to the largest group (i.e., those with the most images), then 66.9% of first-time offenders (with no criminal history of any kind) who plead guilty face a guideline of 78–97 months. A further 6.8% face 70–87 months.

In summary, even if ALL § 2G2.2 possessors were first-time offenders, nearly 74% would be expected to have a recommended sentence in the range of six to eight years or higher (even after adjustment for acceptance of responsibility). This 74%, who all find themselves in the same sentencing range, would include extraordinarily diverse ranges of conduct. For example, a person who downloaded nine thirty-second videos in one session (one of which had a brief depiction of an adult and a 10-year-old engaged in sex) would face the exact same sentencing range as another offender who over a period of years collected 100,000 images of children under the age of 3 being violently raped. That still leaves the other 26% of first-time offenders. Of those defendants, less than 5% would face a recommended sentence below three years. NO ONE would have a recommended sentence below 18–24 months, even assuming a hypothetical such as an 18-year-old, first-time offender whose 17-year-old wife gave him three nude Polaroid photos of herself.[54] This analysis describes just the effect of the four most common enhancements. ANY criminal history (regardless of whether related to the current offense) would also tend to push the guideline range to at or near the statutory maximum, as would any other offense enhancement.

### D. The Commission Engages

Given this failure to differentiate offenders, as well as a historically high rate of variances and departures (62%), the Commission has engaged in several studies. Throughout 2009 and 2010, the Commission conducted regional hearings at which judges addressed their concerns about § 2G2.2.[55] In October 2009, the Commission released a report on the history of the guideline.[56] Now, the Commission is engaged in a private, internal review of the validity of different sentencing factors using data from past cases.[57]

The Commission's internal review is a critical step toward reform. In my experience, most child pornography cases are susceptible to being charged as receipt, possession, or distribution, so the offense of conviction does not necessarily disclose the underlying facts of the case. As a result, reported downward departure and variance rates can account for only part of the story of what is happening nationally. The Commission has access to privileged data (via the pre-sentence investigation reports) that contains information on the offense conduct and history of defendants. Unfortunately, the quality and comprehensiveness of data included in these reports varies widely, with some probation officers generating bare-bones reports (just a few pages in length), while other probation officers regularly generate reports including every possible offense detail (topping forty or even fifty pages in length). With this caveat in mind, however, the data contained in these reports still provide an important opportunity for study. Using this information, the Commission can, if it chooses, *begin* to pierce the veil created by a growing trend over the last three years, in which prosecutors generate a structured, or even within-guidelines sentence by manipulating the plea process.

### E. Prosecutors Respond by Sentence-Structuring

District courts do not have the luxury of blindly following a broken guideline: 18 U.S.C. § 3553(a) compels them to differentiate offenders and impose, for each defendant, the lowest sentence that is sufficient, but not greater than necessary for the facts of each case.[58] These facts include the history and circumstances of each defendant.[59] So, when the guideline clumps almost all offenders into the same or similarly high ranges, and "strict application of the Sentencing Guidelines would create an injustice," the courts have to find an alternate mechanism for deriving a principled sentence.[60] Without a viable guideline to suggest how to differentiate defendants, many courts seek other empirical data to guide their decisions.[61] They solicit expert evaluations, engage in detailed fact-finding, and encourage community input.[62] Sorting the severity of offenders in this way provides detailed bases for each sentence but necessarily results in more work, more contention, and less predictable outcomes than are typical to the federal system.

Prosecutorial discretion is not bound by the constraints of 18 USC § 3553, so many prosecutors are trying alternate methods to minimize litigation and restore certainty to their sentencing hearings.[63] Rather than fight potentially losing sentencing battles before the courts, many prosecutors now choose to address the infirmities of § 2G2.2 by pressuring defendants into forsaking the ability to argue for a non-guideline sentence.[64] The typical means to coerce a set sentence is through some form of forced charge bargaining.

In the child pornography context, charge bargaining normally involves the prosecutor charging, or threatening to charge, receipt or distribution or both. Assuming the exact same facts, changing the charge changes the punishment. For that reason, the threat of a receipt or distribution charge can exert a very powerful coercive effect on plea decisions.

Although charge bargaining occurs in many contexts, attorneys must take the threat of alternate charging especially seriously in child pornography cases. From an evidentiary standpoint, the forensic evidence necessary to prove possession nearly always provides the basis for at least adding a receipt charge as well. As the Sentencing Commission observed in 1996:

> Based on our review of child pornography cases sentenced under the guidelines, there appears to be little difference in the offense seriousness between typical receipt cases and typical possession cases. Indeed, all material that is possessed must at some point have been received (unless it was produced, in which case the defendant would be sentenced under the more severe production guideline).[65]

Simply put, computers are wonderful tools for the prosecution because they do a marvelous job of preserving evidence for later forensic retrieval. Even if the method of detection (e.g., intercepted e-mail transfers) or a defendant's statement to the authorities do not independently establish the grounds for an allegation of receipt, forensic analysis of the hard drive normally will. Furthermore, if the defendant used a peer-to-peer network to possess a file, the government can readily argue on that fact alone that the defendant either attempted, or intended, distribution.[66] Many courts are fully prepared to accept the argument that because peer-to-peer software exists to facilitate file exchanges, use of the software presents a prima facie case of intent to distribute.[67] Thinking that a jury would believe differently involves significant risk.

Charging receipt or distribution is not just easy, it also instantly ups the ante for the defense. First, it shifts the statutory range of confinement from zero to ten years up to not less than five, nor more than twenty years.[68] Second, it shifts the recommend guideline sentence. One of the oddities of the § 2G2.2 guideline is that distribution is punished twice, once as an enhancement based on the type of distribution[69] and again as a modification to the base offense level.[70] So, with the same set of facts, changing the charge to receipt or distribution not only adds a mandatory minimum but also increases the base offense level from 18 to 22.[71] Besides the direct increase in the recommended sentence, this change also means that some other possibly applicable enhancements will now result in marginally higher effects for each enhancement. By way of example, adding the 2-level enhancement for use of a computer to a base offense level of 18 lengthens the sentence by six months, but adding it to a base offense level of 22 lengthens the sentence by 10 months. As the enhancements stack, the effect of each enhancement becomes more significant, so if 2 levels are added onto a series of other enhancements, they can add up to years of extra time instead of just six months.[72]

Consider a specific set of facts charged as receipt instead of possession. As demonstrated earlier, a first-time offender who receives the standard enhancements[73] faces a guideline range of 78–97 months for possession. Charge that same offender with receipt of child pornography, and the guideline range becomes 97–121 months.[74] If the offender used a peer-to-peer program to possess the file, he will almost certainly receive a 2-level enhancement for presumed distribution.[75] The possession guideline would be 97–120 months.[76] That same conduct, charged as either receipt or a distribution, expands the guideline to 151–188 months. That is if the defendant is lucky. If the defendant has the misfortune to reside in one of the circuits where the appellate courts view use of peer-to-peer software as a barter system, then the defendant may very well receive a 5-level enhancement for distribution with an expectation of a thing of value.[77] If that happens, the possession guideline would be 120* months,[78] but the receipt or distribution guideline would be 235–240 months even after acceptance![79] In other words, the same underlying facts almost always leave defendants susceptible to one or more charges carrying grossly higher penalties, both in terms of the guideline range and the statutory range of punishments.

I am familiar with five black-market models in which prosecutors use these dynamics to force defendants to accept irregularly structured § 2G2.2 sentences:

- **The Simple Charge Bargaining Model**. From speaking to other practitioners around the nation, I have concluded that this model appears to be the most prevalent. Once the prosecutor establishes the threat of a receipt or a distribution charge, generic offenders are allowed to plead to possession *IF* the defendant agrees not to contest certain guideline issues or promises not to ask for a departure or variance in excess of a certain amount (often nothing). This type of bargain does not show up in any report as a reduced or bargained-away charge.

- **The Judge Selection Model**. Some districts prepare to file receipt charges in all cases and then determine how to proceed based on which judge is assigned to the case. If a guideline judge receives the case, then the prosecution—knowing that the court will impose all enhancements, and not consider any variances—allows a simple possession plea. If, on the other hand, a judge who grants the enhancements, but *also* sometimes entertains downward variances is assigned to the case, then the prosecutor will constrain that judge's sentencing discretion by superseding with the higher receipt or distribution charge.[80]

- **The Alternate Guideline Model**. Prosecutors in other districts implement their own shadow sentencing enhancements based on factors not included in the guidelines (e.g., more than 10,000 images, participation in a newsgroup, etc.). They then use these factors to decide which cases will be charged as receipt or distribution and which cases will be permitted to settle with pleas to simple possession. In so doing, prosecutors do an end run around the existing guidelines.

- **The Prosecutor as Judge Model**. A fourth model allows prosecutors the discretion, using the same offense facts, to pursue possession charges on some offenders toward whom the prosecutor feels more generous while pursuing receipt or higher charges for other offenders with similar cases. This type of discretion is not guided by any list of defined criteria, creating at least the appearance that sentences are often dictated by prosecutorial whim or fancy.[81]

- **The Bargained Facts Model**. I have received many reports of plea bargaining not by charge, but by the information provided to the probation officer. In my district, I know that probation officers will find—and include—every possible enhancement, because they conduct an independent investigation of the case, beginning with the prosecutor's file, but extending to witness interviews. Practitioners from some other jurisdictions however, have told me of their personal experiences with probation officers who do not conduct these detailed investigations, and who instead rely on the prosecutors to provide the simple offense-conduct summary used in the pre-sentence investigation reports. In those instances, the prosecutor and the defense attorney negotiate the description of the facts that the probation officer will receive. The moderated facts both include and exclude some facts (and enhancements) that were inherent in the complete investigation of the case. The prosecutor then provides that limited set of facts to the probation officer, who includes them in the pre-sentence investigation report. This model produces a so-called guideline sentence, but is based on limited facts that create an unrealistic picture of the offense. In some ways, this sentencing model is the most troubling, because the pre-sentence report has the appearance of completeness, meaning that both the Courts and the Sentencing Commission will draw improper, supposedly empirical conclusions from use of this data.[82]

All of these systems allow prosecutors, starting with similar fact sets, which should result in the same guideline range if charged similarly, to manipulate and generate so-called guideline sentences of vastly different lengths. In effect, the prosecutor becomes the primary sentencing authority. These models also obscure the true state of compliance with § 2G2.2 from national observation and create further disparities between those districts that always pursue the most serious readily provable offense and those that are willing to adjust the charges as they see fit.

Collectively, these practices validate the concern, first expressed by the Sentencing Commission in a 1991 letter to Congress, that treating receipt as more severe than possession is illogical and leads to sentencing manipulation. As the Commission noted at the time: "Recognizing that receipt is a logical predicate to possession, the Commission concluded that the guideline sentence in such cases should not turn on the timing or nature of law enforce-

ment intervention, but rather on the gravity of the underlying conduct."[83]

And, as the Commission warned, separating the receipt and possession base offense levels would

> [n]egate the Commission's carefully structured efforts to treat similar conduct similarly and to provide proportionality among different grades of seriousness of these offenses. Instead, it would require the Commission to rewrite the guidelines for these offenses in a manner that will reintroduce sentencing disparity among similar defendants and render the guidelines susceptible to plea bargaining manipulation . . . through skillful plea bargaining, large-scale traffickers may be able to circumvent the nominally more severe penalties mandated by the Senate amendment by negotiating a plea to simple possession. One primary reason Congress created the Sentencing Commission was to devise guidelines that avoid these unwarranted variations in sentencing for similar conduct. Amendment No. 780 will reintroduce the very problems the guidelines now prevent.[84]

District courts share this fear. A recently published opinion from the District of New Jersey exposes a specific instance in which the Commission's concerns were realized.[85] The court compared two factually similar cases brought at nearly the same time, one of which was charge-bargained to simple possession and the other of which resulted in a trial for distribution. The court observed:

> Federal prosecutors cut deals with defendants such as the one originally offered to David Grober. Behind the scenes of such a plea, had it gone through in this case, lie the untold stories of all the many images of child pornography and all the victims. But as Professor Berman testified, the judge does not learn about them and the sentencing statistics do not reflect them. This Court knows from its own experience about the problematic nature of charging discretion and plea arrangements-issues about which Professor Berman also testified. . . . It is a chilling exercise to take the earlier defendant's plea deal and apply it to David Grober's case. His original indictment charged him with the same two offenses the government charged against the earlier defendant. . . . This Court knows enough of the facts behind the earlier defendant's offense to be unpersuaded that there is an intellectually honest basis to distinguish what the earlier defendant did from what David Grober did. What valid sentencing function transforms David Grober's core conduct from warranting a sentencing range of 51 to 63 months to warranting a sentencing range of 292 months to 365 months merely because he did not plead guilty? . . . There is another pernicious problem embedded in the prevalence of pleas as the vehicle for disposition of downloading offenses. The practice of avoiding the offense characteristics in § 2G2.2 (or having colossal warfare over them) breeds an artificial, unrealistic environment for sentencing;

encourages a failure on judges' part to make a valid contribution to the development of reasonable guidelines; and fosters a skewed empirical record.[86]

### F. The Department of Justice Weighs In

Although charge bargaining has helped some local prosecutors manage the empirical mess, the DOJ must consider the bigger picture. The DOJ is sensitive to the uncertainty and difficulty an ill-fashioned guideline creates and, like the Commission, has an interest in ensuring that judges adhere to the guideline regime as a whole.[87] A nonfunctional guideline, such as § 2G2.2, threatens to damage the credibility of the overall sentencing model and thereby jeopardize the entire system. Perhaps for these reasons, even while accusing the federal courts generally of inconsistency in regard to the guidelines, the DOJ recently informed the Sentencing Commission:

> We think the report to Congress ought to recommend legislation that permits the Sentencing Commission to revise the sentencing guidelines for child pornography offenses and that suggests what any revised guidelines might look like. Over the last two decades, Congress has directed the Sentencing Commission to amend the guidelines for child pornography offenses on a number of occasions. *See* Treasury, Postal Service, and General Government Appropriations Act of 1992, Pub. L. 102-141, section 632, October 28, 1991, 105 Stat. 876; Sex Crimes Against Children Prevention Act of 1995, Pub, L. 104-71, December 23, 1995, 109 Stat. 774; Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (the "PROTECT Act"), Pub. L. 108-21, section 401, April 30, 2003,117 Stat. 672-73. Collectively in these bills, Congress directed the Sentencing Commission to increase the base offense level and to add certain enhancements, including enhancements for the use of a computer in the commission of the crime and for the number of images involved in the crime. We believe changes in the use of technology and in the way these crimes are regularly carried out today suggest that the time is ripe for evaluating the current guidelines and considering whether reforms are warranted. Consideration ought to be given to updating many aspects of the child pornography sentencing guidelines to better calibrate the severity and culpability of defendants' criminal conduct with the applicable guideline sentencing ranges.[88]

### G. Conclusions About the State of § 2G2.2

In sum, over the last three years, § 2G2.2 has become one of the most litigated and least followed guidelines. In fact, *most* judges sentence *most* § 2G2.2 defendants (including distributors) below the bottom of the applicable § 2G2.2 guideline range. A defendant receiving even a low-end sentence is likely receiving a harsher sentence than most similarly situated defendants in most other federal courtrooms. In other words, § 2G2.2 has failed. The current guideline neither produces sentencing recommendations that are perceived as just, nor fosters consistency in sentencing from one jurisdiction to the next. As one court summarized the empirical mess, "This Court's scrutiny of the guidelines has led it to the conclusion that the [2G2.2] guidelines do not guide."[89]

## III. Theories About the Correlation Between Viewing Child Pornography and Danger to Society

### A. What Motivated the Change in § 2G2.2 Sentencing Enhancements?

Even those citizens who care about criminal justice issues generally are unlikely to extend much sympathy to the plight of child pornography possessors. As one judge eloquently summarized public perception:

> Possessors of child pornography are modern-day untouchables. We cannot fathom how they can be aroused by images of prepubescent children being brutalized. And, because we cannot imagine that we personally know anyone so perverted, we are not bothered by the idea that these men are cast out to serve long periods in prison. Their prurient interests are so foreign that our citizens want them permanently removed from society. Many fear that those who view these images will also personally harm a child. And, wanting to punish someone for the crimes that these horrible images embody, society seeks harsh sentences for anyone who participates in this market. Rarely able to catch the monsters that create the images, society reflexively nominates the consumers of this toxic material as proxies for the depraved producers and publishers. The resulting punishment under the Guidelines may be more a reflection of our visceral reaction to these images than a considered judgment of the appropriate sentence for the individual.[90]

Why then would a jury, once its members actually viewed the vulgar evidence of a child pornography case at trial, become *less* likely to demand a maximum jail sentence?[91] Could it be that commonly held beliefs about the nature of child pornography (in the abstract) do not survive application to a specific, real offender? The judge in the *Cruikshank* case theorized that society punishes child pornographers as a proxy-defendant for the actual producers (i.e., active child molesters). I propose that a subtly different factor is at play. In the abstract, most people I meet assume that anyone who consumes child pornography *will molest in the near future*. In other words, those who seek harsh sentencing for child pornography are really using a child pornography charge as a proxy-*crime* for punishing assumed future child molestation by *that same offender*. Those who support the proxy-crime approach view child pornography as being so highly correlative with future molestation that the offenses deserve almost equivalent sentences.

If this hypothesis is correct, then science should establish that child pornography consumption corresponds to a high rate of post-release contact offenses. As I will show, the numbers and facts do not support such a hypothesis.

## B. Arguments over a Correlation Between Child Pornography Consumption and Past Contact Offenses

Certainly, some portion of the offenders caught with child pornography have, in fact, committed past contact offenses with children.[92] Prior to the development of effective online investigations, law enforcement often discovered child pornography incident to the investigation of specific allegations of sexual abuse by that same offender.[93] In those cases, dual offending of some sort was therefore readily quantified.

The open question was whether dual-offending arrests accurately described the relationship between the consumption of child pornography and contact offenses. An answer could not be derived simply by looking at the records of dual-offense investigations, because dual offenders might represent only a small percentage of the overall population. By analogy, if the police investigated hundreds of bar fights, they might note an overwhelming percentage of brawlers are also underage drinkers—but would that tell them anything about the likelihood that a teen who drinks a beer at home or at a party is likely to go to a bar and join in a fight?

Research into the correlation between child pornography use and past contact offenses produced numerous studies, including the so-called Butner Redux survey.[94] Prosecutors often cite the Butner Redux article authored by Bourke and Hernandez to support the proposition that child pornography possession is a nearly perfect proxy for past child molestation.[95] From this proposition, the prosecutor then makes the argument, either explicitly or by implication, that a defendant charged with possession of child pornography "is statistically more likely than not to have actually committed [a past] act of [hands-on] child abuse" and therefore deserves the most severe punishment available.[96] Taken in isolation, the Butner report does seem to establish a strong correlation between use of child pornography and *past* contact sex offenses.[97]

However, the science behind the study has drawn equally great criticism. Researchers in the scientific community have identified severe methodological flaws in the study, compelling some to conclude that the Butner study "epitomizes the class of articles . . . that are inadequately designed and consequently misleading in their results."[98] For instance, numerous study participants later disclosed that they fabricated or distorted their criminal histories, without consequence, in order to stay in the program and avoid forced reentry into the general prison population.[99] The specifics of the study remain clouded, including why those particular 155 offenders were selected from a population of approximately 12,000 sex offenders in the Bureau of Prison at the time.[100] As one court concluded about an early version of the study:

In sum, the Court will not consider the results of the Butner Study unless and until either the Government or the researchers provide transparency for its methodology and a compelling explanation for its many apparent failings. While the Court is loathe to simply agree with a mostly unchallenged expert, the Court can find no error in Rogers' conclusion that the Butner Study "isn't scientifically vetted, doesn't meet scientific standards for research, and is based upon, frankly, an incoherent design for a study."[101]

Hernandez himself, in an address at the Annual Research and Treatment Conference of the Association for the Treatment of Sexual Abusers warned:

Some individuals have misused the results of Hernandez (2000) and Bourke and Hernandez (2009) to fuel the argument that the majority of cp [child pornography] offenders are indeed contact sexual offenders and, therefore, dangerous predators. This is simply not supported by the scientific evidence. . . . The incidence of contact sexual crimes among child pornography offenders, as we reported in our studies, is important and worthy of considerable empirical examination. However, it is not a conclusive finding that can be generalized to all CP offenders notwithstanding, some individuals in law enforcement are tempted to rely on a biased interpretation of our study (i.e., to prove that the majority of CP offenders are child molesters).[102]

## C. The Misplaced Nature of the Butner Debate

The vigorous in-court arguments for and against the validity of the Butner study do not contribute to a meaningful conversation about *future* danger. What gets lost in the Butner debate is that even an empirically perfect study into past histories would have little utility in federal sentencing decisions. If a perfectly designed and executed study showed a 25%, 50%, or even 75% correlation to past abuse, it would not change the way each offender is sentenced, because the system does not, and should not, punish offenders for what it is *feared or statistically estimated* they might have done at some point in the past. When it comes to past conduct, the system punishes for what the government can *prove* the offender did.

That being said, statistical risk is a tool when assessing *future* danger. The use of criminal history categories for example, is intended to take into account the likelihood of future misconduct. In this regard, studies such as Butner, though interesting and potentially important for other purposes, are far less relevant to federal sentencing practice than studies assessing risk of what offenders may do in the *future*.

As the court in *United States v Johnson* pointed out when considering the Butner study, "The inference that the Government asks the Court to draw is distasteful and prohibited by law. Uncharged criminal conduct may generally only be considered in sentencing if proved by a preponderance of the evidence."[103] Even if a significant

correlation was hypothetically established for offenders generally, any such study would still necessarily

> fail to demonstrate whether [an individual] Defendant has, personally, previously assaulted a child sexually. At most, the Study reveals that a majority of other individuals with a similar criminal history committed crimes against children, but the Court cannot see how evidence of those individuals' crimes establishes by a preponderance of the evidence that Defendant committed a prior sexual crime.[104]

By analogy, a study might demonstrate a conclusive link between people with certain tattoos and prior participation in violent drug gangs that engage in indiscriminate violence. Under those circumstances, a defendant with an MS-13[105] tattoo is caught, charged, and convicted for possession of a marijuana cigarette. American justice would not sentence him based on the presumption that he previously shot at police during a drug deal, or killed rival gang members, unless specific and reliable evidence proved such former conduct by means of past convictions.[106] The courts would, however, care a great deal about studies that accurately assess former MS-13 members' postconviction amenability to supervision, general recidivism rates, and likelihood to engage in later gang-related violence.

### D. A DOJ Prediction as to What Factors Predict Future Contact Offenses

I frequently encounter prosecutors who argue that § 2G2.2 sentences must be rigorously enforced to prevent future molestations. In support of their opinion, they often cite a 2006 study by Michael Seto that found more than half of child pornography consumers qualify as pedophiles.[107] The prosecutors who cite this article often presuppose that if a pedophile[108] views child pornography, then he will soon take the presumed next step into becoming an active child molester. The idea is that "the compulsion to collect child pornography images may lead to a compulsion to molest children, or may be indicative of a propensity to molest children."[109] As I will explore subsequently, at least one study has examined and begun to debunk this hypothesis.

For its part, in a report to Congress, the DOJ hypothesized the following alternate predictors of future risk:

> Certain factors or characteristics, or combinations thereof, can signal that a particular child pornography offender poses a higher risk of being or becoming a contact offender. Interviews of law enforcement officers in this field, along with a review of research studies, suggest that the following factors or characteristics, alone or in combination, may signal such a risk:
> - The offender has a prior history of sex offenses.
> - The offender demonstrates a certain commitment to the collection or trade or both of child pornography.
> - The offender has been involved in the collection or trade of child pornographic images for a relatively long time.
> - The offender participates in online child pornography communities.
> - The offender uses more than one technology to collect or trade child pornography.
> - The offender uses advanced technologies to collect, or trade, or both, child pornography.
> - The offender uses sophisticated technologies or practices to avoid detection.
> - The offender shows an interest in images depicting extreme sexual conduct or very young victims.
> - The offender exhibits extreme care building, maintaining, and categorizing his collection of child pornography.
> - The offender communicates with other offenders in online communities about his sexual interest in children.[110]

The DOJ report acknowledged, however:

> An offender who purchases child pornography from a commercial web site, however, is not necessarily high-risk and may even be an entry-level offender. Paying for child pornography has not been shown to be an indicator of risk, and offenders buy child pornography for a variety of reasons. The fact that an offender resorts to paying for images may or may not signal a relative lack of sophistication. In addition, although some commercial sites have freshly produced sex abuse images, many simply recycle old images that are otherwise available elsewhere on the Internet. By contrast, some private trading groups have more extreme and new material and membership in some of these groups is strictly vetted by the offenders operating the groups. Individuals must actively seek these groups to gain access, create usernames and passwords to gain entry, and often dedicate significant amounts of time to a particular group to maintain membership.

> Similarly, an offender using pure P2P technology may signal less of a risk than an offender using a technology that combines P2P file sharing with the ability to interact with like-minded offenders. This is because pure P2P technology only requires a blind search of the network for images and videos using a search term; it does not require much personal investment or any personal contact to acquire images. Of course, these observations are not universal and those who trade on basic peer-to-peer can pose the same risk to a child as an offender using an encrypted message board to trade images. Similarly, an offender who does not use encryption or other evasive technologies can always pose the same or greater risk to a child than one who does.[111]

The DOJ report also recognized that pedophiles (individuals who are sexually aroused by children) may be a different, though sometimes overlapping population, with child molesters (who may or may not be particularly aroused by children, but who do commit sexual acts against them). The DOJ provided reference to a study that "although child molesters . . . use pornography to groom potential victims, pedophiles . . . are less likely to molest a child after viewing pornography."[112]

In sum, the DOJ wishes to explore the idea that sexual deviance, criminal history, online behavior patterns, and participation in a community of offenders may predict molestation behaviors. In contrast, many prosecutors in the field make the simpler assumption that use of child pornography suggests pedophilia, which in turn demonstrates a high risk of taking the presumed next step.

## IV.  Science Moves Beyond Theory to Provide Some Answers About Current Consumers and Risk Factors

With the caveats that all predictive science is imperfect and that recidivism can be difficult to identify and quantify, recent studies have begun to test these governmental hypotheses. These studies provide some insight into the behavior of online offenders and relevant risk factors for recidivism.[113] The data and findings of this nascent body of research is crucial to understanding and quantifying the future risk these offenders pose to society, and to reforming § 2G2.2 to better serve the public interest. For that reason, this article reviews several of these recent studies in detail, providing excerpts of critical findings.

### A.  A Note on the Importance (or Lack Thereof) of a Pedophilia Diagnosis

Although many prosecutors cite Seto for the proposition that child pornographers are pedophiles and, ergo, are likely to molest, Seto does not himself endorse this position. Consistent with the distinction drawn in the DOJ report between the label *pedophiles* (those with sexual interest) versus *molesters* (those who act), Seto recently wrote:

> There is increasingly strong rhetoric about the dangers of the internet, including claims of a large and profitable child pornography industry . . . and vast online networks of pedophiles, child pornography offenders, and sex offenders against children. There is little research, however, to support the rhetoric or to guide major policy and legal changes that are taking place as a result . . . much of what laypeople and professionals believe about pedophiles and sexual offending against children . . . is not supported by empirical evidence.[114]

### B.  The Seto Report (April 2009)[115]

This 2009 symposium paper introduces readers to recidivism studies on child pornography offenders. Seto offers an overview of what is known about child pornography

consumers, specifically considering "the empirical evidence regarding the risk posed by adult male child pornography offenders."[116]

Seto begins with a warning about the use of the Butner study: "Some researchers and policy-makers have cited data on the contact histories of child pornography offenders as evidence of the great risk posed by child pornography offenders. However, there is an important distinction between sexual offense history and the likelihood of new contact sexual offenses."[117] Seto then explains that there is

> a seeming paradox in the data that are beginning to emerge about adult male child pornography offenders. This is a group of men who are likely to be pedophiles, yet are nonetheless relatively unlikely to go on to have sexual contact with a child, especially if they have no such history in their past. If replicated in further research, this suggests there may be a group of pedophilic individuals who are unlikely to act upon their sexual interest in children.[118]

In order to explain why many pedophiles might not ever molest, Seto explains that there are

> two major dimensions of risk: (1) antisocial tendencies, indicated by criminal history, antisocial personality traits, antisocial attitudes and beliefs, and so forth; and (2) atypical sexual interests, indicated by sexual arousal to children, coercive sex, or other atypical targets or activities, sexual victim choice, and so forth (Hanson & Morton-Bourgon, 2005; Seto, 2008).[119]

Although "atypical sexual interests represent an important (though not the sole) motivation for sexual offending,"[120] it does not identify who is willing to act on their interest. Meanwhile, "antisocial tendencies represent the willingness of the person to act upon their sexual motivation."[121] As applied to Internet-only offenses,

> child pornography offenders have engaged in a behavior (accessing sexual depictions of children) that indicates they are likely to be sexually interested in children, and as a group are likely to show a pattern of sexual arousal to children consistent with this inference. However, they score relatively low on measures of Assessing Risk antisocial tendencies, indicating they are relatively less likely to act upon their sexual interest in children.[122]

### C.  Seto and Eke (2005)[123]

The aforementioned 2009 symposium piece is based on a 2005 study conducted by Seto and Eke.[124] That study was one of the first to engage in a detailed examination of documented child pornographers, with the goal of determining what factors successfully predicted the likelihood that child pornography offenders would later commit a contact sexual offense.[125] The study followed 201 child pornography offenders for a period of years after

their release from prison,[126] and ultimately determined that the greatest indicators of risk to reoffend or to commit a contact sexual offense were prior history of contact offenses, as well as prior criminal history. Seto and Eke concluded, "Only one of the offenders with only child pornography offenses committed a contact sexual offense in the follow-up period . . . **our finding does contradict the assumption that all child pornography offenders are at very high risk to commit contact sexual offenses involving children.**"[127] [emphasis added]. Seto and Eke found that the valid indicators for later commission of contact offenses were prior criminal history, as well as prior instances of contact sexual abuse.[128]

### D. The Endrass Study (2009)[129]

In 2009, another team of researchers conducted their own, six-year follow-up of 231 child pornography defendants to test the Seto and Eke findings. "The aim of this study was to examine the recidivism rates for hands-on and hands-off sex offenses in a sample of child pornography users."[130] The researchers recommended additional study, but found that after six years,

> [o]nly 3.9% of offenders were investigated for subsequent pornography possession;[131] only 0.8% were investigated for possible child sexual abuse;[132] and [t]hese recidivism rates after a follow-up time of six years indicate that the risk of re-offending for child pornography consumers is quite low. . . . Consumption of child pornography alone does not seem to represent a risk factor for committing hands-on offenses in the present sample—at least in those subjects without prior convictions for hands-on sex offenses.[133]

During the study, researchers noted certain features of child pornography consumption, notably:

> The high accessibility of the Internet has changed the consumption of child pornography. According to Cooper, Delmonico and Berg [6], three attributes of the Internet, called the "Triple A Engine," facilitate the consumption of child pornography: Accessibility (millions of websites are accessible 24 hours a day, 7 days a week), affordability (acquiring the material does not demand substantial financial resources), and anonymity (no personal contact with others is needed to consume child pornography). Quayle, Vaughan, and Taylor [7] also underline the importance of the ostensible anonymity of the Internet for the consumption of Internet child pornography, as it does not require contacting a dealer and the material can easily be acquired at home. Furthermore, virtual pornographic material can be stored easily and no strenuous effort is needed to keep the illegal material hidden [8].[134]

Endrass and colleagues then attempted to determine "whether consumers of child pornography pose a risk for hands-on sex offenses."[135] In choosing a model for study, Endrass decided that "research designs following-up on a sample of offenders convicted of child pornography consumption would appear to be the best approach" for assessing risk factors.[136]

Ultimately, the researchers concluded:

> The empirical literature does not put forward any evidence that the consumers of child pornography pose a considerably increased risk for perpetrating hands-on sex offenses. Instead, the current research literature supports the assumption that the consumers of child pornography form a distinct group of sex offenders. Though some consumers do commit hands-on sex offenses as well—the majority of child pornography users do not. Previous hands-on sex offenses are a relevant risk factor for future hands-on sex offenses among child pornography users, just as they are among sex offenders in general. The consumption of child pornographic material alone does not seem to predict hands-on sex offenses.[137]

### E. Seto, Hanson, and Babchishin (2011)[138]

In 2011, Seto, Hanson, and Babchishin engaged in a meta-analysis of twenty-four prior studies[139] of Internet offenders with follow-up periods of one-and-a-half to six years.[140] The researchers hoped to answer two major questions: "(a)What is the likelihood that an online offender has a history of offline sexual offending," and "(b)What is the likelihood that an online offender will go on to commit an offline sexual offense in the future?"[141]

As to the first question (past behavior), the data were variable. The controversial Butner study was identified as an outlier in every way from the other studies.[142] Of the remaining studies, official reports suggested that 4.8% to 11.2% of offenders had previously engaged in a contact sexual act, whereas self-reported instances ranged closer to 50%.[143]

The answer to the second question (postconviction recidivism) was both more uniform and somewhat striking. Although as many as 50% of offenders might self-report that at some time in their pre-arrest past they had committed some form of contact misconduct, less than 5% of that same body of offenders would commit some new sexual offense during the postconviction follow-up period (2% of all offenders committed a contact offense and 3.4% committing a new child pornography crime).[144] A detailed analysis of the data led Seto and colleagues to conclude:

> Given that many online offenders are strongly aroused by child pornography (Seto et. al 2006), our results suggest that pedophilic interests do not necessarily result in contact sexual offenses against children . . . those individuals who act on their pedophilic interests are likely to have personality traits and life circumstances that facilitate antisocial behavior and criminality (See Seto 2008) . . . The low recidivism rates of online offenders may be used by some readers to minimize the seriousness of the online crimes committed. We believe this would be a mistake. . . . It would also be a mistake to fail to differentiate offenders by the risk they pose.[145]

For online sexual offenders, research is needed to establish the extent to which the risk factors for offline sexual offenders also apply . . . Even if the same risk factors are relevant, it appears the recidivism rate for online offenders are lower than the base rates obtained for offline sexual offenders due to group differences on some risk factors.[146]

Seto, Hanson, and Babchishin found that all offenders convicted of an Internet-only instant offense were at low risk to recidivate, but that there was nevertheless a clear distinction between those offenders who had previous contact convictions and those who did not. Specifically:

Online offenders rarely go on to commit detected contact sex offenses. During the follow-up period (up to 6 years), less than 5% of offenders were caught for a new sexual or violent offense. Two studies found no sexual recidivists. . . . The observed rates will increase with longer follow-up periods and not all new offenses are detected. Nevertheless, these rates are substantially lower than the recidivism rates of typical groups of offline sexual offenders. It is quite possible, however, that some online sexual offenders have relatively higher recidivism rates. **Eke and Seto (2008) found that those online offenders who already had a history of offline offenses showed sexual recidivism rates higher than expected rates for typical sexual offenders. . . . In contrast, the online offenders who had no history of contact offenses almost never committed contact sexual offenses, despite a comparably high likelihood that they were sexually interested in children.**[147] [emphasis added]

and

Those who had any kind of prior criminal history, sexual or nonsexual, were more likely to offend in the future, including committing contact sexual offenses during the follow-up. **Only one of the child pornography offenders with no prior contact sexual offense history committed such an offense during the 2.5 year follow-up** . . . criminal history as well as substance abuse problems predicted contact sexual offense after the 3.5 year follow-up.[148] [emphasis added]

Beyond the presence of prior contact offenses, one of the possible risk factors that Seto, Hanson, and Babchishin identified was the method of acquiring child pornography: "Those offenders convicted of crimes involving non-internet child pornography were higher risk for sexual re-arrest than were offenders whose sexual crimes were restricted to the internet."[149]

### F. Wollert, Waggoner, and Smith[150]

This study, conducted by a team that included two federally contracted treatment providers,[151] represents the first published study "compiled on the treatment performance and offense patterns of individuals referred to federally funded outpatient treatment programs after being charged

or convicted of a child pornography offense."[152] Wollert, Waggoner, and Smith reviewed and summarized a variety of recent examinations into the behavior of child pornography consumers, such as the 2009 Elliot study of the psychological profiles of online offenders, which found the following:

Contact Offenders are characterized by a greater number of empathy distortions and cognitive distortions than Internet offenders and a greater bias toward favorable self-description . . . the lower frequency of pro-offending attitudes and beliefs that serve to legitimize and maintain sexually abusive behavior . . . displayed by Internet offenders suggests that they may be unlikely to represent persistent offenders or potentially progress to . . . contact sexual offenses . . . this . . . may contribute positively to Internet Offenders achievement in therapeutic interventions.[153]

The researchers also considered another study, which determined: "[I]t seems that . . . the internet facilitates rather a new kind of crime, namely the possession and consumption of illegal pornography, (rather) than . . . indicating a generally deviant life style."[154]

The report then proceeded to examine the amenability of these offenders to treatment and examines their recidivism rates. For instance, Wollert, Waggoner, and Smith identified a 2007 study into the characteristics of online offenders that found, "[I]nternet offenders appear to be extremely compliant with community treatment and supervision sessions . . . by far the largest group of internet offenders would appear to pose a very low risk of recidivism."[155] Combined with analysis of the available literature on other studies, Wollert and colleagues concluded:

The great majority [of child pornography offenders] will not have post-conviction problems with the commission of contact sexual offenses. It also seems to be the case that CPOs [child pornography offenders] although more limited in their intimate social relations than others, are compliant with supervision and are able to draw on substantial personal resources to benefit from treatment and rebuild their lives.[156]

Ultimately, none of the seventy-two offenders that Wollert, Waggoner, and Smith monitored was arrested for a contact sexual offense during the four-year study period, although two were arrested for repeat pornography offenses.[157] Overall, Wollert and colleagues found:

The results of this study are also consistent with the results of other follow-up studies that show that CPOs do not represent a high risk of recidivism and do not have florid or violent criminal histories. Furthermore, consistent with other findings, it has been our clinical experience that the great majority of offenders in this group generally do quite well in treatment, supervision,

and post-supervision, and are able to conform their behavior to society's expectations. Their responsivity to outpatient treatment, and thus the value of treatment, is reflected in their very low rate of contact offenses (0%).[158]

### G. Wakeling, Howard, and Barnett (2011)[159]

Wakeling, Howard, and Barnett considered the utility of certain actuarial risk assessment tools in predicting recidivism.[160]

The researchers acknowledge, "There is currently some debate about the use of actuarial tools in individualized risk assessment . . . but there is considerable support for using these assessments as part of a wider risk assessment."[161] In other words, although using risk-assessment tools to say what an individual offender is likely to do is questionable, it is hoped that these tools have validity for predicating what *factors* may help predict recidivism generally within a group. Such a conclusion is consistent with one court's finding that

the fact that a person was stimulated by digital depictions of child pornography does not mean that he has or will in the future seek to assault a child. [The defendant], like all human beings, has free will, and neither a psychologist, nor a judge, can predict what a person will choose to do in the future. A court should exercise caution to avoid imposing a sentence for a crime some fear a defendant could commit in the future, instead of for the crime he actually committed and for which he is before the court.[162]

The researchers note that "the heterogeneity of sexual offenders continues to present difficulties in producing risk assessment instruments that are valid for all types of offenders."[163] In the course of their research, Wakeling and colleagues identified four types of Internet sexual offenders:

1. "'periodically prurient' offenders who act impulsively and carry out offending as part of a wider interest in pornography,"

2. "'fantasy-only' offenders who use images of children to fuel their sexual interest in children" and who may have a contact-abuse history,

3. "direct victimization offenders" who see the Web as a tool for pursuing sexual contact offenses, and

4. "commercial" offenders who engage in child pornography trafficking for profit.[164]

Overall, Wakeling, Howard, and Barnett found that those convicted of child pornography offenses scored lower on risk evaluation metrics, were unlikely to recidivate, and, that if they did, they were likely to engage in another Internet offense, not progress to contact offenses.[165] This finding was in stark contrast to the generalists who had a proven contact sexual offense in their past. Those offenders recidivated at a higher rate and were more likely to engage in contact offenses.[166]

This supports the findings of other research that has suggested that Internet specialists do not, as a group, present a significant risk of escalation to contact sexual offenses; in this sample less than 1% of the Internet specialists had a reconviction for a non-Internet-related sexual offense at a two-year follow-up.[167]

Furthermore, this study identified limitations in applying current actuarial tools to Internet-only offenders:

The current study does also indicate that the Internet specialists (those who only have Internet sexual offenses) may be genuinely different from the generalists [those who also have convictions for non-internet sexual offenses], as the former reoffend at a significantly lower rate. . . . Indeed, the incidences of both sexual and violent reoffending among specialists are so low that it may be impractical to construct and validate a population-specific risk predictor for these offenders.[168]

Wakeling, Howard, and Barnett also identified topics for future research, including whether participation in an online group of offenders indicated a higher risk than "lone searching for indecent images."[169] In terms of immediate practical guidance, Wakeling and colleagues suggested, "What is clear from this research is that among all Internet sexual offenders, it is those in the high-risk and very-high-risk [i.e., generalist offenders with a history of contact offense convictions] that require the greatest attention, and to whom services and interventions should be directed."[170]

### H. A Report from the Field

In *United States v. C.R.*, the Probation Office for the Eastern District of New York was asked to prepare a report detailing its experience monitoring a population of child pornography offenders.[171] The resulting seven-page report detailed the demographics and history of a body of offenders.[172] In total, probation officers had supervised 280 offenders since 1999, including 108 child pornography offenders,[173] of which 20% reported a prior contact offense. During their time on supervision, 14% had a period of supervision revoked for some reason, but only one offender committed a contact sexual offense while on supervision. Furthermore, in that one instance, the offender self-disclosed the violation during treatment.[174] These findings from the Probation Office tend to validate the amenability of this population to supervision and treatment.

### I. Research into the Nature of Child Pornography Content and Its Effects on Deviance

In 2011, researchers Wolak, Finkelhor, and Mitchell[175] studied trends in child pornography possession cases from 2000 to 2006 in an effort to identify patterns in the nature of child pornography use itself.[176] The researchers

confirmed that "the internet and related technologies have made CP easily accessible and increasingly pervasive."[177] Wolak and colleagues then tested several hypotheses offered by law enforcement.

First, the researchers tested the concern that "accessibility of online CP [ Child Pornography] has caused increases in child sex abuse" and that "CP may trigger sexual abuse by activating and validating sexual urges in CP viewers."[178] In contrast to predictions, Wolak, Finkelhor, and Mitchell found that no matter which source of data they used, "rates of child sexual abuse have declined substantially since the mid-1990s, a time period that corresponds to the spread of CP online . . . there has not been a spike in the rate of child sexual abuse that corresponds with the apparent expansion of online CP."[179] Of course, some offenders may have viewed child pornography and then progressed to molesting children. However, if the next-step hypothesis was generally valid, then a proliferation of readily available child pornography should have translated into a similar growth, not reduction, of actual sex offenses, particularly as U.S. society has become ever more attuned to discovering and investigating abuse. That was not the case.

Next, Wolak and colleagues examined the claim that every year, the age of child pornography victims gets younger and the form of abuse becomes more violent.[180] They found that "empirical evidence about whether CP is becoming more extreme is lacking."[181]

The researchers did find, however, that the use of technology *is* skewing both the size and the amount of extreme content in the normal offender's collection.[182] Although Wolak and colleagues found the same spectrum of images in 2006 as in 2000, they found that the percentage of offenders with "large" collections, and predominantly young collections, was growing.[183] A larger percentage of offenders in 2006 had images of children under 3, collections of images solely of prepubescent children, and collections of larger sizes.[184] "There was no significant difference in the percentage that possessed violent images (i.e., brutality beyond sexual assault)."[185]

New Internet search engines appeared to represent *the* major cause for these trends.[186] Peer-to-peer (p2p) software, for example, represents a substantial change in the acquisition model,[187] a trend away from "more targeted and deliberate"[188] searches toward "broad single-word search terms."[189] Those who used peer-to-peer technology "were more likely to have images that depicted children younger than 3" and violence.[190] "They were also more likely to have CP videos and more than 1,000 still images."[191] Although "there were marked differences in the CP that p2p users possessed . . . only one personal characteristic distinguished this group from other offenders," they were often younger.[192]

The problem apparently originates in the content delivered in response to broad searches. Although "less than 1% of p2p CP searchers included key words that suggested they sought violent materials," a search "might capture

such files, even if the offenders were not specifically looking for violent content."[193] Thus, although "there was no evidence that p2p users were more deviant or criminal than other offenders arrested for CP possession in 2006 in terms of psychosocial characteristics or criminal history," users of peer-to-peer networks "had more extreme images and larger numbers of images."[194] Wolak, Finkelhor, and Mitchell theorized that "the increase in offenders with images of young children may be driven by the dynamics of p2p networks rather than by increasing tastes for images of young children."[195] Finally, they noted that the percentage of dual offenders (someone guilty of both a contact and noncontact offense) dropped from 2000 to 2006.[196]

Wolak and colleagues were not able to evaluate the government's concern that

> [o]ne aspect of child pornography use that deeply concerns investigators is the creation of mini-communities online, where offenders "encourage each other to act out their fantasies."[197] and offenders normalize abusive beliefs.[198] These communities "have restricted memberships, allowing entry only to those who contribute an image not already possessed by the group," which pressures users to acquire and redistribute new material, and encourages eventual participation in contact sex abuse.[199] These "friend" groups also appear to correspond to a heightened incidence rate of contact sex offenses and more extreme levels of distribution activity.[200]

### J. A Summary of Research on Child Pornography Offenders

Child pornography consumption sometimes correlates to pedophilia, and many child pornography consumers report a past history of abuse (i.e., dual offending histories). However, child pornography consumption on its own does not appear to correlate to a significant risk that an offender will progress to a contact offense or recidivate generally postconviction.[201] Overall recidivism rates are very low across *all* demographics for these offenses, although offenders with prior criminal histories are more likely to recidivate, as are those with concurrent violent offenses (including contact sexual offenses) to their child pornography crimes.[202] Overall, child pornography offenders appear to be far more compliant with supervision than other offender populations, and recidivism rates for offenders on supervision or in treatment are particularly low.

Primary risk factors for recidivism appear to include substance abuse issues, criminal history, instability factors (lack of employment, lack of a community support structure, etc.), using non-Internet child pornography, involvement with minors online, and cognitive disorders and distortions of certain types. Neither prolonged collecting nor organized collecting have been found, or even suggested, to be statistically significant by any empirical studies: Several researchers have indicated a desire to

more closely study the correlation between those who engage in group behavior online (such as participating in a private newsgroup) and later recidivism risk.

Changes in technology continue to influence online collections. Computer software programs have made it easier to acquire more images, more quickly. Furthermore, broad searches using peer-to-peer technology tend to result in more extreme image content. The presence of these images does not appear to have any meaningful connection to deviance or intentionality; it corresponds primarily to the type of Internet search engine each age group of offenders uses.

## V. Generally Acknowledged Problems with the Guideline Provisions

In light of all of the data, the empirical validity of the various § 2G2.2 enhancements can be examined. As the DOJ's letter to the Commission acknowledges, two particularly problematic enhancements immediately stand out.[203] These enhancements, which are not supported by empirical research, skew almost all § 2G2.2 sentences upward and fail to provide meaningful separation of offenders. The first problematic enhancement is for use of a computer;[204] the second is based on the number of images.[205]

### A. The Use of a Computer Enhancement[206]

Computer technology can, for all practical purposes, infinitely multiply images of child pornography. Once technology is used to duplicate and mass-distribute images, no practical way exists to ensure that all copies of the image have been destroyed. For these reasons, a mass distributor who knowingly employs a network of international proxy servers to advertise and disseminate new child pornography merits a more severe sentence than someone whose misconduct is limited purely to viewing pictures on a home computer. Unfortunately, the use of a computer enhancement does not differentiate these offenders; it simply applies the same escalated punishment to both.[207]

When the enhancement was first introduced, the Internet was in its infancy, and just 28% of offenders used computers.[208] Nevertheless, the Sentencing Commission had already identified concerns that have since proven prescient:[209]

Online pornography comes from the same pool that can be found in specialty magazines or adult bookstores . . . thus, the differences between print and computerized porn is not in the content of the images, but in the means of distribution. . . . "Downloading" cyberporn is similar to receiving pornography through the mail. . . . At the other end are large-scale, commercial pornographers. Creating and maintaining a B[ulletin] B[oard] S[ystem] or Website with pornography is similar to opening an adult bookstore . . . persons who upload, send, or post illegal images to accessible sites should be held accountable for the harm done when child pornography is widely

disseminates or falls into the hands of children. . . . [but] What seems apparent is that a person's culpability depends on *how* they use a computer.[210]

Not all computer use is equal . . . sentencing policy should be sensitive to these differences in culpability so that punishments are tailored to fit the circumstances of each individual's case.[211]

The adjustment does not distinguish between persons who email images to a single, voluntary recipient and those who establish a BBS and distribute child pornography to large numbers of subscribers . . . the two-level adjustment might be narrowed to apply only to cases that involve distributing child pornography in a way that makes is widely accessible, such as posting it on a BBS or Website. However, a statutory amendment may be necessary to make these kinds of distinctions, because the current statutory directive is aimed broadly at all persons who use a computer to transmit child porn, including receivers and possessors.[212]

Over the last fifteen years, practical experience has validated the Commission's concerns. With 96.2% of offenders now using a computer, the enhancement is essentially part-and-parcel of the offense.[213] As one frustrated judge explained, "As widespread as computer use is now, enhancing for use of the computer is a little like penalizing speeding, but then adding an extra penalty if a car is involved."[214]

The enhancement as it exists now fails to distinguish a defendant who is a threat to the community from one who is not. As another judge explained, "[E]mpirical data does not show that using a computer as a means to possess and view pornography is a more serious or culpable offense than viewing the same images if they had been received by another medium such as through the mail."[215]

In fact, as discussed previously, both government officials and recidivism scientists now believe that non-Internet access of child pornography is a greater indicator of culpability and danger.[216] Empirical studies seem to confirm that "offenders convicted of crimes involving non-Internet child pornography were a higher risk of sexual re-arrest than were the offenders whose sexual crimes were restricted to the Internet."[217] Although more research is needed to explore this dynamic, it may be that acquiring hard copies of child pornography requires much greater forethought and intentionality, and demonstrates a commitment to use systems, such as the mail, that are less susceptible to government detection. It may also be that this sort of intentionality is a sign of someone more committed to sexualizing children. Alternatively, it could be that offenders who only engage in activities on the Internet somehow view their Internet use as mere fantasy that is separable from their real (vs. online) lives, and are thus less likely to engage in misconduct offline.

As things stand however, imposing an increased punishment for an act that involves less effort and appears to signify a smaller risk of future dangerousness is simply

not rational. In my own trial practice, I still occasionally see clients who receive a DVD in the mail and who have neither the intention nor the capability to redistribute the material. The prospective sentence varies, with the critical test being whether the court believes the defendant intended to view the material on a 42″ TV or a 15″ laptop monitor (the more seriously punished offense under § 2G2.2). The enhancement has even come into play where a computer was used to check on the delivery status of the mailed package. In my experience, whether you are a judge, a prosecutor, or a defense attorney, there is nothing either principled or dignified about standing in front of the public arguing over whether to impose a higher or lower sentence based on where a defendant sat in the living room while watching an illegal movie. No matter how the court rules, the fact that the sentence hinged on that variable detracts from public respect for the law.[218]

### B. § 2G2.2 (b)(7) The Number of Images Enhancement[219]

The number of images enhancement is based on no study or evidence. It has no practical value for sorting offender culpability or danger. It needs to go.

### 1. A Note on the Procedural History and Empirical Basis for the (b)(7) Enhancement

In my previous article, I detailed the unsettling procedural history behind the Protect Act of 2003, which introduced the number of images enhancement.[220] To review, the provision was authored by Jay Apperson, aide to Rep. Sensenbrenner of Wisconsin. Instead of submitting the matter to his boss, a Congressman familiar with Guidelines issues from his role as chairman of the House Judiciary Committee, Apperson approached freshman representative Tom Feeney. Rep. Feeney had, at that point, only one bill to his Congressional record, a resolution to recognize the cheerleaders of the University of Central Florida.[221] As was likely intended, Rep. Feeney undertook no study of the measure before inserting it as a last-minute addition to the large and complicated Amber Alert bill being presented for Congressional vote.[222] The amendment itself was a small insertion to the overall Amber Alert bill, and "the image enhancements," written by Apperson, "exist as unexplained sentence increases that are not tied to the purpose of the overall amendment in which they appear."[223] No empirical basis for the enhancement was ever offered. Nevertheless, this amendment represents the first instance since the inception of the Guidelines where Congress directly amended the Guidelines Manual.[224]

In response to these particular points, I have personally witnessed a prosecutorial sentencing argument that the changes made to § 2G2.2 in 2003 were enacted only after testimony by numerous legal scholars before the Judiciary Committee. The prosecutor invited the court to conclude that because legal experts spoke to Congress prior to the passage of the Protect Act, the number of images enhancement deserves respect. In the cases in which I have seen

this claim, no specific substance of the supposed testimony is ever offered to the courts.

After researching the claim, I am confident that Congress never heard testimony related to the number of images enhancement. Although it is technically accurate to say that several scholars spoke to Congress that year about child sex offenses, their testimony was particular to the Amber Alert system and possible ways to rewrite statutory obscenity definitions.[225] The common subject all the listed experts addressed were proposals on how to respond to *Ashcroft v. Free Speech Alliance*.[226] These scholars primarily offered advice on how to structure obscenity statutes to avoid running afoul of First Amendment issues related to virtual images and filtering software, and they expressed various offers of advice and support for child pornography investigations and prosecutions generally.[227] Not only did these scholars apparently *never* address the § 2G2.2 enhancements at issue, but when the Feeney amendment was added to the Protect Act and slipped into the enormous Amber Alert package, the Head of the House Judiciary Committee (Jay Apperson's boss) was one of those people who expressed dismay at the fact that there had been no debate on the Feeney provisions.[228] Thus, no evidence exists to support an argument that the Judicial Committee scrutinized or even considered the number of images enhancement.

Neither the Commission, the courts, nor the scientific community were behind the number of images enhancement when it became law. Now, eight years later, no studies have been done to demonstrate that this enhancement either effectively sorts offenders by moral culpability or that it effectively predicts risk or danger going forward. Courts throughout the country are imposing sentences using a number of images enhancement that apparently burst into being from an empirical vacuum. To be blunt, thousands of inmates are each receiving years longer to their terms of confinement, at great expense to the American taxpayer, because a Congressional aide had a wild hare of an idea.[229]

### 2. A Market Analysis

At a gut level, of course, the number of images enhancement has some resonance. After all, drug offenders are punished more if they have more drugs.[230] In that market, drug quantity is designed to serve as an imperfect[231] means of identifying each offender's significance in the drug distribution network. Furthermore, any drug consumption depletes the pool of existing drugs, adding to the likelihood that more drugs will be produced. That model does not work for child pornography.

Unlimited quantities of child pornography are available to anyone with a computer and an Internet connection. Some officials highlight the global nature of this problem by speculating that child pornography is a $3 billion to $20 billion annual industry.[232] Regardless of whether child pornography really grosses twice as much as the motion picture industries of the United States and Canada

combined,[233] child pornography is unquestionably more readily available now than it was twenty years ago. Today, every point-and-shoot camera is its own digital lab, eliminating the need for photo development. Those same photos, uploaded to the Internet, become susceptible to endless duplication and redistribution.

A shared experience of anyone living in the United States today is that the World Wide Web contains more of everything than a person could ever view in one lifetime. Want to find blogs supporting your political views? You will never be able to read them all. Want to watch funny videos of people's pets? Thousands of Web sites will help you pass the time. There is more of everything online than there was a decade ago.

In addition, modern software has transformed the process of file discovery and acquisition. Peer-to-peer applications, such as Lionshare, Kazaa, and Limewire, facilitated millions of people's efforts to easily find and readily download untold numbers of files (whether those are legitimate file exchanges between education institutions, the download of the latest music video by Beyoncé, or a series of child pornography images).[234] These types of programs continue to allow users to download files free of charge, and without any person-to-person interaction. Alternatively, for those who just surf the Internet, free programs like NeoDownloader allow anyone, once they find a Web site with interesting content, to download all of the images they want with a single click. The user simply copies the Web address into the program, then the program "will scan the website and download all media files automatically," placing them in a folder where the user can later review them.[235] The effect of these technologies is that whether a person is interested in the Web's funniest home videos or illegal child pornography, it takes only marginally more effort to collect 10,000 images than it does to collect ten.

A secondary effect is that people who download child pornography accumulate all sorts of images with little effort. With the technologies described, "possession and viewing may not be synonymous,"[236] resulting in an offender receiving, possessing, and even redistributing (passively via a peer-to-peer network) "files containing images that he has never even seen or attempted to view."[237] This technology also exposes users to the risk that the files will contain content different from what they had sought or anticipated.[238] This situation is a far cry from the 1980s, when consumers of child pornography would send away for the specific type of child pornography they were willing to buy.[239] In those days, the size and content of a collection was a definite indicator of the nature and scope of the defendant's interests. Today, neither the presence of a few images of bondage, nor the presence of varying amounts of images, necessarily tells much about the defendant. For example, is there one picture of bondage among 1,000 pictures of child pornography, amid 100,000 images of adult pornography? Or, are there 1,000 images and video files, only of child

bondage? The bottom line is that technology has made it "easier to amass more sentencing enhancements"[240] with less effort and less intentionality.[241]

In any event, the proliferation of files online and the ever-increasing quantity of images found in the typical user's possession[242] recently led one federal judge to observe that "the worldwide market for child pornography is so vast that the relative impact of having even 592 images is miniscule."[243] Perhaps, but I would suggest that the market effect of 592 images can actually range from nonexistent to extremely significant depending on the circumstances. The relevant criteria for accurately analyzing a market effect is not the number of images acquired, but the context in which acquisition and distribution occur.

Two examples demonstrate the potentially divergent market effects of common means of receiving and possessing child pornography:

**a.** Example 1: When I began prosecuting these cases in the 1990s, the typical case involved two offenders bartering images with each other. Since that time, the most common case has become that of an offender who found files using peer-to-peer software without social interaction.[244] So, for the first example, consider Mr. X.

Mr. X has 10,000 old images of child pornography from the 1970s and 1980s (before Mr. X was even born). Mr. X found and downloaded these files one day last month using a peer-to-peer software program. He paid nothing for them. The search dialogue in the software helped him find the files, so he also never corresponded with the source in any way. The source of these images was another peer-to-peer user, Mr. Y. Unless Mr. Y (the source of the files) was online at the time and carefully monitoring his computer's background activities, Mr. Y will not even know that his files were copied. His computer will distribute the files without notifying him. It is a silent, unknown transfer.

We know that this is how peer-to-peer networks often function, because this is exactly how many law enforcement agencies locate child pornography.[245] Detectives enter such search terms as "porn," "child porn," "sex," or "lolita" into Kazaa or Limewire, then look at available files giving closer scrutiny to files with suspicious names or suggestive descriptions.[246] The officers then upload some data, confirm it is illicit, and use the information as the basis to get a search warrant.[247] After the detectives complete these steps, they proceed to visit and arrest Mr. X and then seize his computer, all without his knowledge that anyone had ever accessed his files.[248] I have personally experienced this fact pattern, both as a prosecutor and as a defense attorney, countless times.

Now, to analyze the market effect: In this model, there is *no* market effect to Mr. X's actions. Mr. Y received no compensation, either in terms of money or images, so he has no economic incentive to put more files into the market. Likewise, because Mr. Y was unaware of the computer activity, he didn't get any positive emotional feedback or

encouragement for supplying the files. The transfers didn't normalize his behavior, make him feel important, or otherwise alter his future behavior in any way.

This example is akin to a reader entering a library and pulling a Stephen King book off the bookshelf for five minutes, without checking it out and without being observed by anyone else in the library. Unless the library knows the reader is interested in Stephen King books, they won't order more. Unless Stephen King receives more money, or more attention (e.g., a fan letter thanking him for his writing, or a stat on his Web site showing Internet visits), he will not feel encouraged to write additional novels. That is not to say that Stephen King may not write more books, just that the reader has not in any way influenced King's behavior. In this example, the reader is not exerting even a minuscule effect on the market; he is exerting *no* market influence on Stephen King's future behavior whatsoever.

**b.** Example 2: Take another simple fact pattern derived from my experiences as a prosecutor.[249] Mr. A has only five images of child pornography. He acquired them after he posted an instant message in a private newsgroup last week asking for "new, fresh stuff that I've never seen before." Mr. A was delighted when he received an e-mail several days later from a molester calling himself Mr. B. The e-mail contained five pictures of Mr. B improperly touching two naked prepubescent girls and the note, "What do you think? New stuff—no one has seen these!" Mr. A responds by sending an e-mail back stating, "Man, this stuff is great! Super job on getting the neighbor girls to let you do this!"

The market effect of Mr. A's actions are obvious and enormous. Somewhere, a child molester made images, at least in part to satisfy Mr. A's demand for new material. Then, through the process of delivery, that molester received praise for his efforts and was implicitly encouraged to produce more. In the creation and dissemination of the pictures of those unfortunate neighbor girls, a new market was created.

Within the context of that market, Mr. A may be the only source of demand. He may therefore exert tremendous market influence on Mr. B. First, Mr. B may feel emboldened to engage in further molestation. Second, if Mr. A allows others in the newsgroup to know about the great materials he acquired, whole new markets for Mr. B's photos may emerge. Third, Mr. B may have been reluctant to share the images openly before, but he may now feel excited to share more broadly. In all of these cases, Mr. A's receipt and possession may have proven to be the critical step in the foundation of a potentially never-ending proliferation of these pictures around the world, *even though Mr. A never sends the images on to anyone else.*

The point of these two examples is that the number of images enhancement neither predicts nor reflects the market impact of either child pornography offense. Unlike drug cases, consumption of images does not diminish the quantity available to other consumers and does not necessarily lead to the creation of more images. It might or it might not, depending on the facts of each case. Although parties may speak of "THE" market for child pornography, there are in fact untold numbers of mini-markets, some bigger and some smaller, each with their own dynamics and influences.

**3. The Effect of Differing Computer Habits**    Finally, a fact that is widely known among those who regularly try these cases, but that I never seem to encounter in case law, law review articles, or scientific literature, is that people with 600-plus images are usually the dopes. I have worked on cases where I believe the offender really had only just accessed child pornography on one occasion, and on other cases where the offender had tens of thousands of images he intended to distribute worldwide. Each of those ends of the spectrum are relatively uncommon, and easy for a judge to sentence.

What about the rest of the crowd? Although not universally true, it is my experience that the defendants with fewer images are increasingly the *more* morally culpable or dangerous defendants. Generally, these defendants have greater computer sophistication, planned their activities, took efforts to conceal their Internet use, and digitally cleansed their computer's hard drive and browser cache on a regular, if not daily basis. Many have the experience to look at and then discard images at each session, aware that it will always be easy to find more online and that by clearing their cache, they are minimizing their risk of discovery and legal trouble. In other words, although forensic analysis may establish the number of images present on a hard drive, that data is unreliable in assessing actual consumption patterns and tends to mislead courts about the nature of offenders.

**4. A Summary of the Flaws of the Number of Images Enhancement**    So, here is the practical reality of the number of images enhancement:

  a.  "the internet leads to the easy, and sometimes unintended, collection of massive collections of images, including those with violence and prepubescent children";[250]

  b.  with each short video clip counting as 75 images, 600 images is a shockingly low cap;

  c.  perhaps for that reason, a majority of offenders receive the maximum enhancement for number of images, and almost all offenders receive some enhancement;[251]

  d.  those assessed fewer images may actually have accessed as many or more images, or they may not;

  e.  individuals with fewer images may have had a much greater market effect, whereas those with 600-plus images may have had none;

  f.  the number of images enhancement can effectively double a sentence;

g. the actual effect of the enhancement is that sophisticated criminals, who will be more difficult to monitor going forward, tend to receive significantly smaller sentences than new offenders who have little experience with computers or the child pornography community;

h. the focus on a simple yes-no test leads to cursory investigations in which participants in the system have no incentive to analyze the context of the images;

i. there is no empirical evidence that the number of images reliably assess culpability or dangerousness; and

j. the focus on the number of images has distracted everyone from exploring more reliable ways to differentiate offense conduct.

This is the truth on the ground, and the reason why this enhancement receives so little respect, even from the DOJ.

## VI. Other Problematic Provisions

### A. Deviance as Measured by 2G2.2(b)(2) and (b)(4)

Most citizens are probably more concerned about offenders who possess or traffic in particularly young and violent images involving sexual acts than they are about offenders who simply have pictures of naked teens. That thinking is rational, because a defendant who has a particularly intense focus on the violent rape of young children evidences greater moral culpability and may prove a heightened risk to reoffend (because of his cognitive distortions). Unfortunately, the current enhancements do a poor job of identifying and differentiating these most troubling offenders from the crowd.

The current guideline seeks to punishes two types of image content. First, under § 2G2.2(b)(2), defendants receive a 2-level enhancement if any file "involved a prepubescent minor or a minor who had not attained the age of 12 years."[252] Second, under § 2G2.2(b)(4), defendants receive a 4-level enhancement if any material "portrays sadistic or masochistic conduct."[253] The latter enhancement applies even if the judge is absolutely certain the defendant had no intention of receiving, possessing, or distributing such material.[254] In practice, a single file often triggers both enhancements.

To understand why requires reviewing the meaning of "sadistic and masochistic conduct."[255] The Commission has never defined this phrase.[256] The dictionary meaning of sadism is "sexual perversion in which gratification is obtained by the infliction of physical or mental pain on others (as on a love object)," "delight in cruelty," or "excessive cruelty."[257] Masochism means "sexual perversion characterized by pleasure in being subjected to pain or humiliation especially by a love object" or "pleasure in being abused and dominated."[258] Someone unfamiliar with the federal courts might therefore expect this enhancement to apply in the limited circumstances

of a child put into traditional bondage or S&M situations, such as being tied, whipped, and so forth. That is not the case.

The sadistic and masochistic conduct enhancement applies to a broader set of images. In federal courts today, the enhancement generally applies to any image that, by its creation, is likely to have caused physical or emotional pain, even if no evidence of pain or particular cruelty can be seen in the image.[259] As a result, any picture that depicts a young minor engaged in a sexual act with an adult will normally trigger both the (b)(2) and (b)(4) enhancements even if it contains no overt celebration of pain or humiliation, because it is presumed that the sexual act will either hurt or cause emotional distress.[260]

It is unclear why this enhancement applies even if the court concludes that possession was unintentional and unknowing. Judges are well positioned to make determinations about a defendant's claim of being unaware of specific file content. If a defendant has one sadistic image amid 10,000 others, the image was almost certainly incidental. If 90% of those same 10,000 images meet the criteria, well, good luck to that defendant. In addition, metadata can normally reveal whether a file has been accessed after the date on which it was received (indicating that the user had accessed the material and then chose to keep the file for further use).

That being said, let us focus on the defendant who has incidentally received some files that he has not yet viewed (again, this case is often readily demonstrated using metadata). Retributive justice theory does not indicate the need for an enhancement, because a user who is unaware of a file and its contents does not share the moral culpability of someone who knowingly seeks out violent and masochist images. Similarly, it is hard to see what utility the enhancement achieves. Does anyone think that fear of a 4-level enhancement for accidentally receiving the wrong file is going to be the one thing that deters a would-be child pornographer who, otherwise aware of all the aspects of the laws, was nevertheless willing to risk twenty years in prison, lifetime supervised release, and complete social ruin in order to look at other types of child pornography?

Now, consider these enhancements as applied to two possible fact patterns:

Example 1. The first defendant is a 19-year-old high school senior. He possesses 20,000 images of adult pornography, 1,000 images of 16- to 17-year-old teens posing nude, and one picture of a prepubescent girl engaging in sex with an adult (acquired accidentally when he chose to download a bunch of files that met his search for the term *hot girl*). The defendant never opens or views the disturbing image of the prepubescent child. The overall collection includes several pornographic pictures of a 17-year-old cheerleader from his school, which he looks at and then e-mails to a friend. In sending the e-mail, he hopes his friend will send him some more images of other nude cheerleaders from their senior class in return.

Analysis of Example 1. In this context, this offender appears to have a normal sexual orientation, including a preference for females in his approximate age range or older. He does not appear to have any particularly deviant sexual focus. It is socially accepted that he dates one of the high school sophomores depicted in his collection, and it is legal for them to engage in sex (though not for him to possess her naked image that she made and gave to him). Nevertheless, the presence of the unviewed prepubescent image, when discovered on his computer, will trigger enhancements for both age and sadistic conduct. These enhancements will hold even though both the judge and the prosecutor are completely convinced that this acquisition was inadvertent. Additionally, because he forwarded an illegal image (of the high school cheerleader) in the hopes of receiving a similar item of value, this offender will receive a 5-level distribution enhancement.[261] If his friend is only 17, this defendant will receive a 6-level enhancement for distribution to a minor that was intended to induce the minor to engage in illegal activity.[262] Assuming a distribution charge, the guideline range will be 22 (base) plus 2 (use of a computer) plus 2 (a person under 12) plus 4 (sadistic or masochistic conduct) plus 5–6 (distribution to a friend with the expectation of inducing the friend to reciprocate with similar material) plus 5 (greater than 500 images), minus 3 (acceptance), resulting in a final range of either 210–262 months or 235–293 months.[263]

Example 2. The second defendant is a 40-year-old man. He operates a server on which he maintains approximately 40,000 images of children. All of the images depict children under the age of 5, severely bound as they are subjected to the worst forms of sexual, physical, and emotional abuse. The defendant has distributed these images to literally thousands of other people over the Internet, not from any expectation of receiving images in return, but simply because he feels proud of himself for being a recognized warehouse of free images.

Analysis of Example 2. This offender demonstrates marked deviance and cognitive distortion. He is also a primary market source for these images. Nevertheless, he will face a lower sentence than the high school senior. Combining his base offense level of 22 for distribution, plus 2 (use of a computer) plus 2 (a person under 12) plus 4 (sadistic or masochistic conduct) plus 2 (distribution other) plus 5 (greater than 500 images), minus 3 (acceptance) results in a guideline range of 151–188 months.[264]

These examples, though extreme, highlight the failures of implementing these yes-no criteria in practice. When enhancements apply to 95.6% and 73.7% of offenders respectively,[265] separation of offenders is minimal. Furthermore, common practice is that once an enhancement is triggered, investigating agencies do not further scrutinize the evidence. The question becomes, Is there a better way to adjust for deviant content?

As a prosecutor in an indeterminate sentencing system, I employed a more refined means of assessing unusual deviance and danger. First, we would review a potential defendant's entire collection of materials, in order to develop perspective on their content. Next, we would use metadata such as dates created, accessed, and modified to identify patterns in the files. For instance, one offender might have received or accessed images of bondage and prepubescent children intermixed with standard adult pornography. Another offender's viewing and acquisition patterns might reveal that although he started with images of teenagers, he later sought and viewed only prepubescent images, then finally targeted only images depicting abductions and rapes of particularly young children. Although we had no empirical study to validate our theory, we reasoned that the offender who indiscriminately blundered around the Internet, viewing whatever he encountered for free, was less concerning than the offender who focused on increasingly violent conduct, involving increasingly vulnerable children. Finally, we would review secondary materials, such as diaries, online chat logs, e-mails, and so forth for contextual information, bearing in mind that people on the Internet often misrepresent their experiences or engage in fantasies they would not actually want to experience in real life. All of these factors would then guide our sentencing recommendations to the court.

These techniques are difficult (though not impossible) to adapt to guideline use. The simple fact is that the system now encourages everyone to avoid thoroughly investigating these cases. Certainly, adopting a more holistic approach would involve somewhat more labor, would be slightly more resource intensive, and would require development of greater forensic expertise by all parties. However, when viewed in comparison to other types of cases, these supposed burdens are put into proper context. In a simple fraud case, which often yields a sentence of probation up to just a couple of years confinement, I regularly see evidence that a *team* of FBI investigators reviewed thousands of pages of bank documents over a period of months, often with expert assistance. On the other hand, when provided a child pornography case likely to result in a twenty-year sentence, the case is often investigated by one agent, with marginal time invested, and no outside experts are used to scrutinize or give context to the findings. If a system that required a more holistic assessment of the evidence were adopted, this blasé approach to the evidence would have to change, and judges, probation officers, and defense attorneys would need to spend more time considering the evidence. I suggest that it is not unreasonable to expect the parties in the system to take the time to really understand the facts of the case.

Opportunities for the defense to access and scrutinize the data would also need to change, lest an undesirable amount of subjectivity and unreliability were experienced in the process.[266] By way of example, I recently defended a client on an obscenity charge. The Postal Service reported:

"Agents found thousands of images of pornography, with nearly all depicting females with shaved/partially shaved pubic hair, several depicting females portrayed as teens, dressed in school clothes, cheerleaders, with braces or virgins. Several of the magazines advertised child oriented material."[267]

This report was incorporated into the relevant conduct description of the offense contained in the preliminary pre-sentence investigation report. In order to review the data, I had to travel three hours to a remote location, where the evidence was treated as protected contraband. When the images were examined however, it became apparent that the defendant had *no* images of child pornography, nor of any children at all; **there was no contraband**. The so-called schoolgirls were voluptuous adult porn stars. Although a few of the models did wear short skirts and thigh-high stockings (Catholic schoolgirl Halloween costumes), the defendant's subscriptions were to *Juggs*, *Busty*, *Hooters*, and *Playboy-Voluptuous Vixens* magazines. Ultimately, the court rejected and verbally scorned this part of the report. This almost comical distortion of content nevertheless demonstrates the potential for inconsistent applications of the holistic analysis process, especially in districts where the defense is constrained in their access to the forensic data.

Regardless of the difficulties of reforming the system, the check-the-block exercise used today needs to be jettisoned. The two image-content enhancements fail to differentiate offenders and illogically punish defendants for content that may not reflect either their moral culpability or their risk. At least in principle, there is definite utility in some additional punishment for the most depraved offenders. Given that implementation of percentage tests is potentially problematic and matching a holistic analysis to a defined guideline test is difficult to conceptualize, let alone implement, another alternative is possible. What is really needed is a system that encourages all parties to carefully evaluate the evidence and that allows the judge to efficiently adjust for gross deviance when it is present to an unusual degree. I therefore propose that the Commission remove these two content enhancements, but add an application note that reads as follows:

> An upward departure may be warranted if the evidence clearly demonstrates a significantly abnormal focus on acquiring images involving prepubescent or violent content, or if the evidence clearly demonstrates that the defendant intentionally distributed images involving prepubescent victims or material focused on overt violence and cruelty towards children. Abnormality must be determined in relation to offenders of this category, not to society at large. Intentionality for such a departure should not be presumed from the use of file sharing software.

### B. Peer-to-Peer Distribution

Peer-to-peer software also creates problematic evidentiary situations. It appears that the nature of the software causes users to more readily face severe sanctions both for the size and nature of the content they acquire so easily. They are also susceptible to additional punishment as designated distributors (or would-be distributors) unless they took a series of active steps to change the default settings of the search engines. As noted and discussed in a recent law review, "[T]he primary deficiency of the distribution enhancement is that it is broad enough to encompass defendants who *obtain* images via file-sharing services."[268] For these reasons, and because studies show that these users are generally no more deviant or dangerous than the average person, the Commission should consider carefully an application note regarding distribution that would require a higher threshold of intentionality to trigger the enhancement.

### C. The Pattern of Activity Enhancement[269]

As demonstrated in scientific studies, a past history of convictions for sexual offending is a risk factor for later recidivism.[270] Section § 2G2.2(b)(5) superficially appears to address this risk by including a 5-level enhancement for anyone who "engaged in a pattern of activity involving the sexual abuse or exploitation of a minor."[271] A pattern is defined as

> any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, whether or not the abuse or exploitation A) occurred during the course of the offense; B) involved the same minor; or c) resulted in a conviction for such conduct.[272]

The problem with this enhancement is that it dramatically increases the risk of improperly enhancing a sentence. In other typical federal offenses, offense levels and enhancements are based either on relevant conduct (actions related to the instant offense) or on past conduct proven by conviction.[273] This basis is used despite the fact that a long history of arrests for robbery, burglary, and assault might suggest that a felon caught with a stolen firearm is more dangerous than one with no history of similar arrests. For this one special enhancement in child pornography cases however, judges are allowed to consider allegations from a time not related to the instant offense. The application note does not require any specific level of reliability.[274] Presumably, that means the preponderance standard of evidence applies and there is no limit to the timeframe of consideration.[275] Under the combination of these factors, a defendant may have to fight a vague accusation, made by one person, about conduct supposedly occurring ten, twenty, or even thirty years earlier. There appears to be no valid penological reason to incorporate a broader consideration of uncharged offenses for someone who possesses child pornography than for a drug dealer with past allegations of drug dealing or a violent felon with past allegations of assaults on law enforcement, and so on. The Commission should consider adjusting this enhancement to prevent injustice.

### D. Supervised Release

In *United States v. Apodaca*, the Ninth Circuit noted another problem with the treatment of 2G2.2 offenses—the length of supervision.[276] Congress authorized federal judges to individually fashion supervised release terms for child pornography offenders, with terms as short as five years in length, up to and including the remainder of an offender's life.[277] This range allows a judge to consider the incredible differences between someone who merely possesses a handful of child pornography images versus someone who commercially produces or distributes child pornography for mass consumption. The Sentencing Commission spurns this particularized approach and recommends a uniform policy: "If the instant offense of conviction is a sex offense, however, the statutory maximum is recommended."[278]

No body of research appears to necessitate such a sweeping policy. This policy does not take into account the very stringent conditions (such as no use of a computer) that typically accompany supervision for these offenders and does not consider an individual low-risk offender's interest in someday surviving the stigma of a (potentially) youthful offense. It also does not account for all the studies and findings from the field (discussed previously) that have validated the typical child pornography consumer's amenability to treatment, supervision, and compliance with the law.

Just as important, this policy subverts the public's interests in protecting itself against the most dangerous offenders. Probation officers have limited resources and hours in their day. If they must monitor every sex offender for life, then while they are working with a 55-year-old man who was caught with child pornography thirty-six years earlier and who has been out on release for thirty-three years without incident, they cannot simultaneously engage with the two-time child molester who is unemployed and has been out on release for only six weeks.

This policy requires revision.

### VII. Further Proposals for Revising the Guideline NOT Based on Existing Provisions

#### A. A New Structure for Base Offense Levels

As detailed previously, and as the Commission has reported for more than twenty years, using separate base offense levels for receipt and possession encourages sentencing disparities. I anticipate that the upcoming Commission report will show that increased use of peer-to-peer networks has resulted in an increase in the same phenomenon as it applies to distribution. In other words, the Commission is likely to find a significantly smaller set of convictions for receipt and distribution charges paired with relatively higher frequencies of distribution enhancements (b)(3) for those remaining (nominal) receipt and possession offenses.

A more rational system would focus less on the charge of conviction and more on the moral culpability

and danger of the client. The firearm guideline (2K2.1) is imperfect and has earned just criticism for the manner and extent to which base offense levels are dictated by past convictions.[279] However, given studies showing that future danger in child pornographers is tied to past convictions for sexual offenses, there may be merit in considering a conviction-based model for child pornography offenses.

Under this model, the base offense level for a child pornography crimes would be tiered not on the basis of the instant nominal conviction (possession, receipt, or distribution), but instead on the basis of prior convictions. Reflecting the greater moral culpability of someone who has already been convicted of a prior child pornography offense, or the greater danger of one who is found with illegal pornography after a prior conviction for a contact offense, base offense levels would be higher for these offenders. Consistent with studies about the ease of acquiring child pornography and the low danger to recidivate for other offenders, offense levels would be set so that a relatively low punishment would result for a criminal history category I offender who engages in typical conduct. Careful study would be necessary to determine exactly what categories of offense would trigger higher base offense levels, which prior offenses more strongly correlate to danger, and the amount these offenses should affect the base offense level. It is possible, for example, that the base offense level for a prior conviction for child pornography would be one standard higher than for a first-time offender, whereas those with prior convictions for contact sex offenses would start several standards higher. Distribution activity would be accounted for purely by an enhancement tied to the type of intentional distribution.

Given past experience with the stacking of enhancements based on either inadvertent or typical acquisition patterns, a safety valve might also be considered for first-time offenders who fit certain criteria. Perhaps first-time child pornographers who evidence certain safety factors and agree to submit to appropriate sex-offender counseling while on supervision would be eligible for reduced sentences (a safety valve). This approach would tend to encourage participation in treatment programs and help the probation officers charged with supervision to better differentiate how to prioritize resources and supervision techniques.

In addition, the Commission might consider replacing the flawed enhancements discussed in this article with other enhancements better designed to sanction unusual and more reprehensible conduct.

#### B. Introduction of New Materials Enhancement

The Supreme Court recognizes that child pornography images "are a permanent record of the children's participation [in illegal sexual acts] and the harm to the child is exacerbated by their circulation."[280] This idea bears additional thought. In one sense, every time an image (of a child's past abuse) is viewed, it constitutes a perpetuation of the crime. Unlike many strident prosecutors, however,

I would suggest that this harm may often be largely theoretical or remote. Once thousands of offenders have seen a set of images, "one additional person possessing the images makes little difference to the victim and is much less harmful than the initial posting of an image to the internet."[281] For example, if child M, now an adult, is unaware that an offender saw her image, his viewing the image is not a proximate cause to *any* trauma she experiences. Instead, the trauma (other than that of the underlying sexual act itself) primarily comes from the fact that M has no way of knowing which (if any) people she passes on the street may have seen and delighted in the images of her past abuse. Her fear is grounded in "the knowledge that 'the images are forever in cyberspace, able to resurface at any time.'"[282]

That fear exists in perpetuity, regardless of whether any new offenders ever view her image. The harm begins as soon as those images get onto the Internet, and the associated fears can never be put totally to rest. For that reason, society can acknowledge that a special harm is created by the first person who sends a set of images out into the ether of the Internet. Using the example of Mr. A from the newsgroup, if he takes the new images Mr. B sent him privately and redistributes them throughout the newsgroup, he bears a heightened moral culpability. He did not create the images and he was not the first one to distribute them, but he is the one who ensured that they would always be out there. For that reason, I would support a Commission effort to consider carefully wording an enhancement that recognizes this specially culpable act.

Practically, this enhancement is not going to occur often. However, digital metadata is not limited to just file size and creation date. Embedded in most digital photographs are a treasure trove of data, including when a picture was taken, the time of day, the camera used, and so forth. Furthermore, when detectives do identify child victims, it is my experience that they exhaustively search e-mail accounts, chat logs, and so forth in an effort to track any flow of those files. In many circumstances, detectives can identify how the evidence got onto the Internet. I have personally participated in a number of cases in which we could positively identify the offender who initially released images to the Internet.

Taking all of this information into account, I would support consideration of an enhancement worded, "If the offense involved the *initial* introduction of materials onto the Internet, increase by __ levels." An application note would then clarify,

> Initial introduction does not require that the defendant was a party to the production of the materials. Initial introduction describes those circumstances in which the defendant was the first individual to disseminate the materials to persons unknown in a manner preventing authorities from tracking, and destroying all images. An offender may receive the files by e-mail but still qualify as the initial introducer of the images if he is the first to post them in a news-

group, on a peer-to-peer distribution network, etc., because it is this act that results in dissemination to parts and persons unknown, and (perhaps) impossible to discover. The government must present clear evidence that the files in question have never been previously posted onto such a source.

### C. Directly Encouraged Production Enhancement

Although I have generally recommended changes designed to lower § 2G2.2 provisions, these recommendations largely hinged on the fact that most current enhancements do a poor job of treating offenders fairly (i.e., scaling punishments to moral culpability and future risk). Put another way, they punish people for assumed market effects that often do not exist, or that are overstated.

One type of case serves as an example of the opposite situation. Such a case defies current efforts to impose a consequence for contributing to the market for child pornography. I am speaking of a small category of offenders who don't fit into any of the established criteria and who avoid the common market enhancements—those who directly encourage others to produce new child pornography for their consumption.

Not everyone who receives, requests, or even pays for child pornography fits into this group. As the DOJ fairly acknowledged,

> An offender who purchases child pornography from a commercial web site . . . is not necessarily high-risk and may even be an entry-level offender. . . . In addition, while some commercial sites have freshly produced sex abuse images, many simply recycle old images that are otherwise available elsewhere on the Internet.[283]

These offenders may be contributing to a market, but they are not the direct cause of new molestation.

But what about when someone pays to join a Web site that promises to produce new content on a regular basis? The defendant is choosing to pay money in exchange for assurances that someone will engage in fresh conduct for his consumption. "Having paid others to 'act out' for him, the victims are no less damaged for his having remained safely at home, and his voyeurism has actively contributed to a tide of depravity . . . providing an economic motive for creating and distributing the materials."[284]

I am also speaking of another defendant, the hypothetical Mr. A from the newsgroup. If Mr. A had just sent an e-mail asking "for pictures I haven't seen before," he wouldn't necessarily deserve special condemnation. But Mr. A did more. Once he realized the images were newly produced, he corresponded with the producer, praising his efforts, and by implication requesting more. If Mr. A sends e-mails such as, "Let me know once you get those photos of the neighbor girls. I can't wait," then Mr. A directly encourages the market for new images. And, although Mr. A may not be any more of a future risk than

other consumers, sometimes society has an interest in imposing additional punishment on particularly egregious and immoral behavior. Mr. A's behavior deserves a higher punishment, regardless of whether that punishment significantly affects either general or specific deterrence, because he directly asked someone to act as his proxy-rapist.

In these special instances, I would support consideration of a significant enhancement. Any such enhancement would use carefully worded language to target this specific subgroup of interactive offenders and the moral culpability they bear for the likely creation of new images. For example, "If the offense involves direct evidence that the defendant provided verbal or written encouragement to another to produce new images, or that he paid another on the premise that the other would then create new images, increase by __ levels." An application note might then read,

> "New images" means the creation of new child pornography files, images, or videos that did not previously exist in any form, not the dissemination of preexisting images, or the doctoring of images, already in existence but unknown to the offender. For example, a posted request for "new images I haven't seen" would not meet the intent of this section, while payment for either "new content created each week" or for "images made just for me" would qualify.

### D. Areas to Research

The government has theorized that participation in secret swapping clubs may be more predictive of future dangerousness than paying for child pornography or accumulating materials over a normal peer-to-peer system. Everyone would benefit from studies either proving or disproving this theory. Because several research teams have indicated an interest in exploring this issue, the Commission might recommend that Congress fund a study.

The Commission should also be concerned that their data sets do not include much of the relevant information necessary to assess the validity of pre-sentence investigation data. It would be worthwhile to conduct a sample study to ascertain how accurately pre-sentence reports document the real circumstances of these offenses. Such an effort might have broader merit, helping to suggest reforms that would lead to greater uniformity in the drafting of these reports generally.

Finally, the Commission should recommend that Congress support additional research into noncontact sexual offenses.

### VIII. Conclusion

The guideline is founded on false assumptions about the nature of most offenders and metes out extraordinarily high recommended sentences for all but a few. Available scientific data and statistics, as well as practical experience, demonstrate that punishment focuses on the wrong variables and that the current system regularly scores minor offenders the same or worse than maliciously dangerous offenders with more sophistication. The system needs change and, given the past history of flaws with this guideline, judicial scrutiny will hopefully frustrate any attempts to whitewash the problem or introduce new provisions based on mere hypotheses. Still, the temptation may exist for demagoguery and for demonization. Studies detailing some offenders' self-disclosed *pasts* may be consciously used to obscure scientific studies about *postconviction* recidivism and supervision. The fact is, every study out so far demonstrates that the vast majority of these offenders—particularly those with no history of contact convictions—respond well to supervision, and that only a small portion are likely to recidivate in any meaningful way. I ask you, the reader, to consider the changes proposed in this article and contribute to the discussion. We would all benefit from a system that is more fair, more just, and more transparent.

### Notes

\* Troy Stabenow is also adjunct professor of criminal law, the U.S. Army Judge Advocate General's Legal Center and School; adjunct professor of law, the University of Missouri Law School; and author of *West Federal Forms: District Courts—Criminal* (5th ed. 2012). University of Missouri law students Danielle Karalis, Ryan Buck, and Joseph Fischer provided significant helpful research assistance for this piece.

1 Troy Stabenow, Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines (revised Jan. 1, 2009), *available at* http://www.fd.org/pdf_lib/child%20porn%20july%20revision.pdf. Note that § 2G2.2 is the guideline for those offenders convicted of possessing, receiving, or distributing child pornography but who are not tied by relevant conduct to the creation and production of the materials. Regardless of the conviction, anyone involved in the creation of child pornography is cross referenced to Guideline § 2G2.1 for punishment—*see* § 2G2.2(c).

2 *See, e.g.*, United States v. Grober, 595 F. Supp. 2d 382, 391 (D.N.J. 2008) ("the government downplayed Stabenow as a biased 'deconstructionist,' pointing out that he is a federal public defender and has an agenda that is apparent from the title of his article").

3 *See, e.g.*, U.S. Sentencing Commission, The History of the Child Pornography Guidelines (Oct. 2009), *available at* http://www.ussc.gov/Research/Research_Projects/Sex_Offenses/20091030_History_Child_Pornography_Guidelines.pdf.

4 *See* http://www.ussc.gov/Legal/Federal_Register_Notices/20110915_FR_Final_Priorities.pdf at ¶ 5.

5 Letter from Jonathan Wroblewski (Director, Office of Policy and Legislation) to Hon. William K. Sessions III, Chair, U.S. Sentencing Commission (June 28, 2010) at 6 [hereinafter Wroblewski letter].

6 United States v. Cunningham, 680 F. Supp. 2d 844, 849 (N.D. Ohio 2010) ("Crimes involving the exploitation of children provide fertile ground for grandstanding politicians."); *see also* Melissa Hamilton, *The Efficacy of Severe Child Porn Sentencing: Empirical Validity or Political Rhetoric*, 22 Stan. L. & Pol'y Rev. 545, 576 (2011).

7 I prosecuted these cases for the 1st Infantry and 1st Armored Divisions of the U.S. Army while on active duty (1999–2003), and at Fort Leonard Wood while in the reserves (2008–2010).

8   I obtained my defense experience first as an active-duty attorney in the U.S. Army while serving as the Senior Defense Counsel for Fort Riley (2003–2005) and, more recently, as an Assistant Federal Public Defender for the Western District of Missouri (2005–present).

9   I am not speaking about the use of specific case anecdotes. Both the defense and the prosecution can easily cherry-pick extreme anecdotes of horrible abuse or marginal criminality to illustrate supposed trends in the nature of the offenses. Hypotheticals, on the other hand, may be used to illustrate strengths and flaws in various guideline provisions.

10  See U.S. Sentencing Commission, Results of Survey of United States District Judges January 2010 through March 2010 (June 2010), available at http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_Survey.pdf.

11  Id. at 13.

12  Id.

13  Id.

14  Id.

15  Id.

16  Only 16% of judges felt that the Guidelines yield a sentence generally too harsh for producers, and only 30% felt the same for distributors. Id.

17  See Amendment 706, U.S. Sentencing Guidelines Manual at Supplement to Appendix C (2008). This ratio has since been modified even lower by both law and the Sentencing Commission. See 21 U.S.C. § 841 and U.S. Sentencing Guidelines Manual § 2D1.1 (2011).

18  Id. See also http://www.govtrack.us/congress/bill.xpd?bill=s111-1789.

19  Kimbrough v. United States, 552 U.S. 85, 89; 128 S. Ct. 558, 563 (2007).

20  See, e.g., Carrie Johnson, Senate Bill Would Reduce Sentencing Disparities in Crack, Powder Cocaine Cases, Post Politics (Washington Post), March 13, 2010, available at http://www.washingtonpost.com/wp-dyn/content/article/2010/03/12/AR2010031204124.html.

21  See, e.g., United States v. Diaz, 720 F. Supp. 2d 1039, 1041 (E.D. Wis. 2010) (listing sample cases in which federal district judges declined to follow 2G2.2).

22  See U.S. Sentencing Commission, U.S. Sentencing Commission's 2010 Sourcebook of Federal Sentencing Statistics, tbl.28, available at http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_Sourcebooks/2010/SBTOC10.htm.

23  Id.

24  See U.S. Sentencing Commission, Third Quarter FY11 Quarterly Sentencing Update, tbl.3, available at http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/Quarterly_Sentencing_Updates/USSC_2011_3rd_Quarter_Report.pdf.

25  See U.S. Sentencing Commission, supra note 22.

26  Id. tbl.27A.

27  Wroblewski letter, supra note 5.

28  See U.S. Sentencing Commission, Report to Congress: Downward Departures from the Federal Sentencing Guidelines 5 (Oct. 2003), available at http://www.ussc.gov/departrpt03.pdf.

29  See U.S. Sentencing Commission, Firearms and Explosive Materials Working Group Report 8, 10 (Dec. 11, 1990).

30  See Amendment 374, United States Sentencing Guideline (2010) at app. C, vol. I.

31  This overview includes a number of child pornography cases in which 2G2.2 was not the primary guideline. See 2010 Sourcebook, tbl.14.

32  Letter from the Federal Public and Community Defenders to the United States Sentencing Commission, August 26, 2011, citing 2010 Sourcebook, tbl.14.

33  See, e.g., United States v. Dorvee, 616 F.3d 174 (2nd Cir. 2010); United States v. Grober, 624 F.3d 592 (3rd Cir. 2010);

United States v. Huffstatler, 571 F.3d 620 (7th Cir. 2009); United States v. Apodaca, 641 F.3d 1077 (9th Cir. 2011); United States v. Janosko, 355 F. App. 892, 895 (6th Cir. 2009); United States v. Tutty, 612 F.3d 128 (2nd Cir. 2010); United States v. Henderson, 649 F.3d 955 (9th Cir. 2011).

34  United States v. Grober, 624 F.3d 592, 608 (3rd Cir. 2010), citing Diaz, 720 F. Supp. 2d at 1045, 2010 WL 2640630, at *7.

35  Dorvee, 616 F.3d 174, at 188.

36  Dorvee, 616 F.3d 174, at 186, discussing U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform (2004), available at http://www.ussc.gov/15_15year/15year.htm at 73.

37  Dorvee, 616 F.3d 174, at 187.

38  Id. at 188.

39  See, e.g., United States v. Janosko, 355 F. App. 892, 895 (6th Cir. 2009) (Discussing the fact that although district courts may choose to reject guideline sentences for child-pornography offenses simply due to policy disagreements with those guidelines, district courts are not required to do so, and considerable deference is due either decision.); United States v. Huffstatler, 571 F.3d 620, 623 (7th Cir. 2009).

40  Id.

41  Apodaca, 641 F.3d 1077 at 1083.

42  This author is not sure why one Sentencing Commission product details 1,708 sentences, and another 1,711. It is possible that one report included three reports forwarded at a later date.

43  U.S. Sentencing Commission, Use of Guidelines and Specific Offense Characteristics: Fiscal Year 2010, at 37, available at http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/Guideline_Application_Frequencies/2010/10_glinexgline.pdf. Note that sadistic conduct includes basically any sexual contact between an adult and a minor under 12 regardless of whether it fits the normal connotation of sadism or masochism. See, e.g., United States v. Dodd, 598 F.3d 449, 453 (8th Cir. 2010), discussing United States v. Diaz, 368 F.3d 991 (8th Cir. 2004).

44  Dorvee, 616 F.3d 174, at 187.

45  United States v. Grober, 595 F. Supp. 2d 382 (D.N.J. 2008).

46  2G2.2(a)(1).

47  2G2.2(b)(6).

48  2G2.2(b)(2).

49  2G2,2(b)7)(A).

50  U.S. Sentencing Guidelines Manual § 2G2.2 Application Note 4(B)(ii) (2010).

51  of Guidelines and Specific Offense Characteristics: Fiscal Year 2010 at 37.

52  Section 2G2.2(b)(4).

53  Dodd, 598 F.3d 449, 453 (8th Cir. 2010).

54  One anomaly of federal law is that the cutoff for child pornography is age 18, although the legal standard for actual sex and even marriage is lower in most states and the military. This hypothetical, is of course, an outlying example that one would hope most prosecutors would not consider charging. Nevertheless, it would be illegal under the law, and is not that different from some actual cases I have been involved with. It also illustrates the effect that stacking these enhancements can play at sentencing.

55  See generally, Public Hearing Testimony and Transcript: 2009–2010 Regional Public Hearings, available at http://www.ussc.gov/hearings.htm; for an excellent summary of these sessions, see Jelani Jefferson Exum, Making the Punishment Fit the (Computer Crime):Rebooting Notions of Possession for the Federal Sentencing of Child Pornography Offenders, 16 Rich. J.L. & Tech. 5–6 (2010).

56 U.S. Sentencing Commission, The History of the Child Pornography Guidelines, October 2009, *available at* http://www.ussc.gov/Research/Research_Projects/Sex_Offenses/20091030_History_Child_Pornography_Guidelines.pdf.

57 *See* http://www.ussc.gov/FEDREG/20090903_FinalPriorities.pdf ¶ 9 and http://www.ussc.gov/Legal/Federal_Register_Notices/20110915_FR_Final_Priorities.pdf ¶ 5.

58 18 U.S.C. § 3553(a).

59 18 U.S.C. § 3553(a)(1).

60 Federal Sentencing Practices and the Operation of the Federal Sentencing Guidelines: Reg'l Hearing Before the U.S. Sentencing Commission, at 6 (July 2009) (Statement of J. Donetta Ambrose, Chief Judge, W.D. Pa.), *available at* http://www.ussc.gov/AGENDAS/20090709/Ambrose_testimony.pdf.

61 *See, e.g.*, the *400-plus-page* (!) written findings in United States v. C.R., ___F. Supp. 2d___, 2011 WL 1901645, (E.D.N.Y. 2011), at Case 09-CR-00155-JBW; *see also* United States v. Grober, 595 F. Supp. 2d 382 D.N.J., 2008.

62 *Id.*

63 I have received literally hundreds of calls from around the United States since 2009 discussing this practice. In preparation for this article, I met with senior federal public defenders from throughout the country to discuss the practices in each district. I also spoke to several current and former Assistant United States Attorneys who confirmed and explained these practices.

64 Many prosecutors demonstrate, often by office policy, an unshakable dedication to the proposition that the guidelines produce the lowest reasonable sentence in every case. *See, e.g.*, United States v. Beiermann, 599 F. Supp. 2d 1087, 1101 (N.D. Iowa 2009).

65 *See* U.S. Sentencing Commission, Report to Congress, Sex Offenses Against Children 11 (1996), *available at* http://www.ussc.gov/r_congress/SCAC.HTM.

66 *See, e.g.*, United States v. Durham, 618 F.3d 921, 927 (8th Cir. 2010), discussing United States v. Dodd, 598 F.3d 449 (8th Cir. 2010). Although the argument related to a guideline issue rather than an offense element, the argument is instructive: "According to the court, while one could hypothesize that a defendant had no knowledge of his distribution of child pornography files via the file-sharing program, 'the purpose of a file sharing program is to share, in other words, to distribute.'" *Id.* at 452. As a result, Dodd imposed a new standard whereby the file-sharing defendant must show "concrete evidence of ignorance-evidence that is needed because ignorance is entirely counterintuitive." *Id.* Without such evidence, Dodd concluded, "a fact-finder may reasonably infer that the defendant knowingly employed a file sharing program for its intended purpose." *Id.* Despite the new requirement placed on the defendant, the court reaffirmed the government retains the burden to prove the enhancement on a case-by-case basis. *Id.* at 452 n.2.

Dodd noted its holding was consistent with the broad definition of "distribution" encompassed within § 2G2.2. *Id.* at 452. The court recognized the Sentencing Commission's recent clarification that "distribution includes posting material involving the sexual exploitation of a minor on a website for public viewing but does not include the mere solicitation of such material by a defendant." *Id.* According to Dodd, "These definitions confirm that distribution as defined in § 2G2.2 includes operating a file sharing program that enables other participating users to access and download files placed in a shared folder, and then placing child pornography files in that folder." *Id.* at 452–53.

67 *Id. See also* United States v Layton, 564 F.3d 330 (4th Cir. 2009) ("We concur with the Seventh, Eighth, and Eleventh Circuits and hold that use of a peer-to-peer file-sharing program constitutes 'distribution' for the purposes of U.S.S.G.

§ 2G2.2(b)(3)(F)." When knowingly using a file-sharing program that allows others to access child pornography files, a defendant commits an act "related to the transfer of material involving the sexual exploitation of a minor"); United States v. Carani, 492 F.3d 867, 875-876 (7th Cir. 2007) (finding the passive nature of peer-to-peer sharing irrelevant); and discussion in Jesse Basbaum, *Inequitable Sentencing for Possession of Child Pornography: A Failure to Distinguish Voyeurs from Pederasts*, 61 Hastings L.J. 1281, 1298 (2010).

68 18 U.S.C. § 2552A.

69 Section 2G2.2(b)(3).

70 Section 2G2.2(a).

71 Section 2G2.2(a)(2), although § (b)(1) sometimes allows for a reduction to base offense level 20. This reduction is becoming less common as many courts treat peer-to-peer possession as presumptively akin to a desire to redistribute. Note, however, that although the base offense level is set by the charge of conviction, anyone may receive the various distribution enhancements, regardless of their charge.

72 For example, the difference between an offense level of 35 and 37 is forty-two months.

73 That is, 600-plus images, a photo of a child under 12, use of a computer, and at least one image counting as sadistic or masochistic.

74 Section 2G2.2(b)(1) will allow for a 2-level reduction under certain circumstances.

75 *See, e.g.* United States v. Dodd, 598 F.3d 449, 452 (8th Cir. 2010).

76 Capped by the statutory maximum for possession.

77 For a discussion of the application of this barter enhancement, *See* United States v. Durham, 618 F.3d 921 (8th Cir. 2010).

78 After acceptance, the guideline range would actually be 135–168 months, but the statutory maximum limits the defendant's exposure.

79 The actual guideline range after acceptance would call for 235–293 months but, again, the statutory maximum caps the defendant's sentencing range.

80 It is a simple process in the federal system to supersede in order to add a more serious offense.

81 Although this model hypothetically would allow the prosecutor to take into account any variable the prosecutor personally finds relevant, even disfavored variables such as sex, race, religion, and so on, I have not heard any complaints of illegal factors being used to determine case outcomes. I have, however, received complaints that factors grounded in no empirical study are often used, such as the prosecutor's subjective belief that a particular defendant is "creepy."

82 Leaving the burden on the probation office to determine whether more investigation is necessary.

83 Stabenow, *supra* note 1, at 7, citing Letter from the U.S. Sentencing Commission to Hon. Edward R. Roybal, Chairman, Subcommittee on Treasury, Postal Service and General Government, Committee on Appropriations, United States House of Representatives, dated Aug. 7, 1991, included in the *Congressional Record* at 137 Cong. Rec. H6736-02 (Sept. 24, 1991) (August 7, 1991 Commission Letter).

84 *Id.*

85 *See* United States v. Grober, 595 F. Supp. 2d 382 (D.N.J. 2008).

86 *Id.* at 398–400.

87 For evidence that many offices follow a strict guideline-sentence policy, consider that in 1,524 out of 1,526 cases in one federal district, prosecutors argued the guideline as the lowest sentence that was sufficient, but not greater than necessary. *See* United States v. Beiermann, 599 F. Supp. 2d 1087, 1101 (N.D. Ia. 2009).

88 Wroblewski letter, *supra* note 5.

89 United States v. Grober, 595 F. Supp. 2d 382, 391, 412 (D.N.J. 2008).

90 United States v. Cruikshank, 667 F. Supp. 2d 697, 703 (S.D.W. Va. 2009).

91 Consider, for example, the fascinating study conducted by Judge James Gwin, *Juror Sentiment on Just Punishment: Do the Federal Sentencing Guidelines Reflect Community Values?*, 4 HARV. L. & POL'Y REV. (2010).

92 Consider, for example, Janis Wolak et al., *Child Pornography Possessors, Trends in Offender and Case Characteristics*, 23 SEXUAL ABUSE 22 (2011).

93 *Id.* at 33.

94 Michael L. Bourke & Andres E. Hernandez, *The "Butner Study" Redux: A Report of the Incidence of Hands-On Child Victimization by Child Pornography Offenders*, 24 J. FAMILY VIOLENCE 183 (2009).

95 *Id.*

96 United States v. Johnson, 588 F. Supp. 2d 997, 1005 (S.D. Ia. 2008).

97 Bourke & Hernandez, *supra* note 94.

98 For a detailed discussion of these methodological flaws, see Richard Wollert et al., *Federal Internet Child Pornography Offenders—Limited Offense Histories and Low Recidivism Rates, in* THE SEX OFFENDER, VOLUME VII (Barbara K. Schwartz ed., forthcoming 2012).

99 *Id.* at 2–13, 2–14.

100 Statement of Andres E. Hernandez to Congress, September 26, 2006, *available at* http://energycommerce.house.gov/108/Hearings/09262006hearing2039/Hernandez .pdf.

101 Discussed in full at *United States v. Johnson*, 588 F. Supp. 2d 997, 1006-1007 (S.D.Ia.2008).

102 From slides presented by Andres E. Hernandez at the 2009 conference.

103 *Id.* at 1005, citing United States v. Howe, 538 F.3d 842, 855 (8th Cir.2008); *and* United States v. Tyndall, 521 F.3d 877, 882 (8th Cir.2008).

104 *Id.*

105 A notoriously violent drug gang. *See, e.g., The MS-13 Threat: A National Assessment, available at* http://www.fbi.gov/news/stories/2008/january/ms13_011408.

106 *See, e.g.,* United States Sentencing Guideline (2011) §§ 2D1.1 and § 2K2.1.

107 Michael Seto, James Cantor, & Ray Blanchard, *Child Pornography Offenses Are a Valid Diagnostic Indicator of Pedophilia*, 155 J. ABNORMAL PSYCHOL. 610, 612 (2006).

108 *See* Hamilton, *supra* note 6, at n.242: The clinical definition of pedophilia requires "[o]ver a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally thirteen years or younger)." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 572 (4th ed. 2000).

109 Wollert et al., *supra* note 98, at 2–7, *discussing* U.S. DEPARTMENT OF JUSTICE, PROJECT SAFE NEIGHBORHOOD: PROTECTING CHILDREN FROM ONLINE EXPLOITATION AND ABUSE (May 2006).

110 THE NATIONAL STRATEGY FOR CHILD EXPLOITATION PREVENTION AND INTERDICTION—A REPORT TO CONGRESS (Aug. 2010) [hereinafter NATIONAL STRATEGY], at 27, *available at* http://www.projectsafechildhood.gov/docs/natstrategyreport.pdf.

111 *Id.* at 28.

112 *Id.* at F-6, F-14.

113 For a discussion of federal inquiries into the link between pornography and contact sex offenses generally, and as applied to child pornography specifically, see Hamilton, *supra* note 6, at 545.

114 MICHAEL SETO, PEDOPHILIA AND SEXUAL OFFENDING AGAINST CHILDREN: THEORY, ASSESSMENT, AND INTERVENTION xi, xii (2008).

115 Michael Seto, *Assessing the Risk Posed by Child Pornography Offenders*, presented for the G8 Global Symposium, March 9, 2009, *available at* http://www.iprc.unc.edu/G8/Seto_Position_Paper.pdf.

116 *Id.* at 2.

117 *Id.* at 3.

118 *Id.* at 6–7.

119 *Id.* at 7.

120 *Id.*

121 *Id.*

122 *Id.*

123 *See* Michael C. Seto & Angela W. Eke, *The Criminal Histories and Later Offending of Child Pornography Offenders*, 17 SEXUAL ABUSE 201 (2005).

124 *Id.*

125 *Id.*

126 *Id.*

127 *Id.* at 202, 208.

128 *Id.*

129 Jerome Endrass et al., *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC PSYCHIATRY 1–7 (2009), *available at* http://www.biomedcentral.com/1471-244X/9/43.

130 *Id.* at 1.

131 *Id.* at 4, 6.

132 *Id.*

133 *Id.* at 6.

134 *Id.* at 2.

135 *Id.*

136 *Id.* at 3.

137 *Id.*

138 Michael Seto, Karl Hanson, & Kelly Babchishin, *Contact Offending by Men with Online Sexual Offenses*, 23 SEXUAL ABUSE 124 (2011).

139 *Id.* at 127.

140 *Id.* at 131, tbl.2.

141 *Id.* at 125.

142 *Id.* at 133.

143 *Id.*

144 *Id.* at 124. The two variables add up to more than the total recidivism rate, indicating that one or more recidivists is responsible for both a contact and a noncontact offense.

145 *Id.* at 140.

146 *Id.* at 137.

147 *Id.* at 136–137.

148 *Id.* at 137.

149 *Id.* at 138.

150 Wollert et al., *supra* note 98.

151 *Id.* at 2–15.

152 *Id.* at 2–1, 2–18.

153 *Id* at 2–9, citing Alexander Elliot et al., *Psychological Profiles of Internet Sexual Offenders—Comparisons with Contact Sexual Offenders*, 21 SEXUAL ABUSE 76, 87–88 (2009).

154 *Id.* at 2–10.

155 *Id.* at 2–10 discussing L. Webb et al., *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 SEXUAL ABUSE 449, 459 (2007).

156 Wollert et al., *supra* note 98, at 2–13.

157 *Id.* at 2–12.

158 *Id.* at 2–18.

159 Helen Wakeling et al., *Comparing the Validity of the RM2000 Scales and OGRS3 for Predicting Recidivism by Internet Sexual Offenders*, 23 SEXUAL ABUSE 146 (2011).

160 *Id.* at 146.

161 *Id.* at 147.

162 *See* Hamilton, *supra* note 6, at 570, *citing* United States v. Ontiveros, No. 07-CR-333, (not reported) 2008 U.S. Dist. LEXIS 58774, at *13 (E.D. Wis. July 24, 2008); 2008 WL 2937539 (E.D. Wis. 2008).

163 Wakeling et al., *supra* note 159, at 149.

164 *Id.*

165 *Id.* at 158–159; 163.

166 *Id.*

167 *Id.* at 164.

168 *See, e.g., id.* at 156.

169 *Id.* at 165.

170 *Id.*

171 *United States v. C.R.,* ___F. Supp. 2d___, at docketed document 99, p. 1.

172 *Id.*

173 *Id.* at 3.

174 *Id.*

175 Wolak et al., *supra* note 92.

176 *Id.* at 22.

177 *Id.* at 23.

178 *Id.*

179 *Id.*

180 *Id.* at 24. *See, e.g., National Threat Assessment* at 2; NATIONAL STRATEGY, *supra* note 110, at 2.

181 *Id.* This finding by Wolak, Finkelhor, and Mitchell invites comment. To investigate these claims, I personally contacted Kenneth Lanning, a retired FBI agent who helped found the board of directors for the American Professional Society on the Abuse of Children, authored *Child Molesters: A Behavioral Analysis for Law Enforcement Officers*, and, perhaps most important, served as a consultant to Congress on child pornography issues during the passage of anti–child pornography laws during the late 1980s and early 1990s. Mr. Lanning reports that he remembers when he first heard the claim that child pornography was becoming disturbingly younger and more violent. It was during a justice conferences in the 1970s. My own experience is that in 2000, I personally prosecuted cases involving brutal snuff videos of an infant dying as the result of a rape. At that time, I heard the same warning. My experience, confirmed by Mr. Lanning, is that the *spectrum* of images remains unchanged. However, it is certainly true that these sorts of extreme materials may be more readily identifiable and available in greater quantities, because this is true of nearly everything on the Internet these days.

182 *Id.* at 37.

183 *Id.* at 30 & tbl.2.

184 *Id.* at 30.

185 *Id.*

186 *Id.* at 37.

187 *Id.*

188 *Id.* at 38.

189 *Id.* at 37.

190 *Id.* at 33.

191 *Id.*

192 *Id.*

193 *Id.* at 37–38.

194 *Id.* at 36–38.

195 *Id.* at 38.

196 *Id.* at 39.

197 NATIONAL STRATEGY, *supra* note 111, at 18.

198 *Id.* at 20–21.

199 *Id.* at 18.

200 *Id.* at 20.

201 *See, e.g.,* Seto & Williams, *Examining the Criminal History and Future Offending of Child Pornography Offenders: An Extended Prospective Follow-up Study*, 35 LAW & HUM. BEHAV. 466 (Dec 2011).

202 *Id.*

203 Wroblewski letter, *supra* note 5.

204 Section 2G2.2(b)(6).

205 Section 2G2.2(b)(7).

206 See STABENOW, *supra* note 1, at 15–17 for a detailed background on the enhancement; *citing* 2006 report at 30.

207 A separate distribution enhancement would apply to the act of distributing itself, but not to the establishment of a sophisticated computer distribution system. *See* § 2G2.2, Application Note 1—"Distribution."

208 STABENOW, *supra* note 1, at 11, 12, 15–17.

209 *See* U.S. SENTENCING COMMISSION, REPORT TO THE CONGRESS: SEX OFFENSES AGAINST CHILDREN—FINDINGS AND RECOMMENDATIONS REGARDING FEDERAL PENALTIES (1996), *available at* http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Sex_Offense_Topics/199606_RtC_Sex_Crimes_Against_Children/199606_RtC_SCAC.PDF.

210 *Id.* at 28, 29.

211 *Id.* at 29.

212 *Id.*

213 U.S. Sentencing Commission, USE OF GUIDELINES AND SPECIFIC OFFENSE CHARACTERISTICS: FISCAL YEAR 2010, at 37, *available at* http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/Guideline_Application_Frequencies/2010/10_glinexgline.pdf.

214 Federal Sentencing Practices and the Operation of the Federal Sentencing Guidelines: Reg'l Hearing Before the U.S. Sentencing Commission, at 6 (July 2009) (Statement of J. Robin Cauthron, former Chief Judge, D. Okla.).

215 United States v. Tapp, 2010 WL4386523 at 6 (N.D. Ind. Oct, 28, 2010); *see also* United States v. Hanson, 561 F. Supp. 2d 1004, 1010-11 (E.D. Wis. 2008).

216 Report of the U.S. Probation Office, *supra* note 171, doc. 99, at 6.

217 Michael Seto, Karl Hanson, & Kelly Babchisin, *Contact Sexual Offending by Men with Online Sexual Offenses*, SEXUAL ABUSE 124, 138 (2011).

218 18 U.S.C. § 3353(a) (2)(A)(in fashioning an appropriate sentence, the court shall consider the need for the sentence imposed to "promote respect for the law.").

219 For a discussion of the procedural history of the number of images enhancement, see STABENOW, *supra* note 1, at 19.

220 STABENOW, *supra* note 1, at 19–23.

221 *See* Michael S. Gerber, *Down with Discretion*, LEGAL AFFAIRS, http://www.legalaffairs.org/printerfriendly.msp?id=547.

222 STABENOW, *supra* note 1, at 19–20.

223 Exum, *supra* note 55, at 11–12.

224 *Dorvee*, 616 F.3d 174, at 185, citing U.S. SENTENCING COMMISSION, FIFTEEN YEARS OF GUIDELINES SENTENCING: AN ASSESSMENT OF HOW WELL THE FEDERAL CRIMINAL JUSTICE SYSTEM IS ACHIEVING THE GOALS OF SENTENCING REFORM 72 (2004), *available at* http://www.ussc.gov/15_year/chap 2.

225 *See* 148 Cong. Rec. S10487-01, 2002 WL 31317842 (Cong. Rec.) Wed, Oct. 16, 2002 *S10487; 149 Cong. Rec. S2301-01, WL 104829 (Con. Rec.) Mon. Jan. 13, 2003 at S244; 148 Con. Rec. S4389-01, 2002 WL 991834 (Con. Rec.).

226 *Id.*

227 *Id.*

228 STABENOW, *supra* note 1, at 19–23.

229 Section 2G2.2(b)(7).

230 Section 2D1.1.

231 This relationship may present a distorted picture of certain offenders, described as mules, who receive marginal to no compensation for serving as the proxy distributors for the actual dealers.

232 *See, e.g.,* NATIONAL STRATEGY, *supra* note 111, at 15, citing Najat M'jid Maala, Report of the Special Rapporteur on the Sale of Children, Child Prostitution, and Child Pornography, A/HRC/12/23 at 10, United Nations, 13 July 2009, *available at* http://www.unhcr.org/refworld/docid/4ab0d35a2.html.

233 Richard Verrier, *Worldwide Movie Box-Office Receipts Rise in 2010*, L.A. TIMES, Feb. 24, 2011, http://articles.latimes.

com/2011/feb/24/business/la-fi-0224-ct-mpaa-stats-20110224.

234 For example, the peer-to-peer program Frostwire has in and of itself been downloaded 33,550,153 times from the popular website CNET; see http://download.cnet.com/1770-20_4-0.html?tag=pfindersrch&searchtype=downloads&query=limewire&filter=platform=Windows|&filterName=platform=Windows| (last visited Nov. 15, 2011).

235 See http://www.neodownloader.com/.

236 Exum, *supra* note 55, at 12.

237 *Id.*

238 U.S. Government Accountability Office, Users of Peer-To-Peer Networks Can Readily Access Child Pornography, *available at* www.gao.gov/cgi-bin/getrpt?GAO-04-757T; *see also* National Strategy, *supra* note 111, at 2.

239 *Id.* at 10.

240 *Id.* at 11.

241 For a sound discussion of the implications, *see* Basbaum, *supra* note 67, at 1300.

242 Wolak et al., *supra* note 93.

243 *See* Exum, *supra* note 55, at 11, citing *United State v. Raby*, No. 2:05-cr-00003, 2009 WL 5173964 at 2–8 (S.D.W.Va. Dec. 30, 2009).

244 Wolak et al., *supra* note 93.

245 *See, e.g., United States v. Pires*, 642 F.3 1 (1st Cir. 2011).

246 *Id.* at 5.

247 *Id.*

248 *Id.*

249 United States v. Hays, 62 M.J. 158 (C.A.A.F. 2005).

250 United States v. Burns, slip copy, 2009 WL 3617448 at 24 (N.D. Ill. 2009); U.S. Dist. Lexis 10642, at 24 (N.D. Ill. Oct. 27, 2009).

251 U.S. Sentencing Commission, *supra* note 43, at 37.

252 Section 2G2.2(b)(2).

253 Sections 2G2.2 b(2) and (b)(4).

254 Section 2G2.2 Application Note 2.

255 Section 2G2.2(b)(4).

256 Other terms are defined at § 2G2.2 Application Note 1.

257 *Merriam-Webster* online dictionary, *available at* http://www.merriam-webster.com/dictionary/sadism.

258 *Merriam-Webster* online dictionary, *available at* http://www.merriam-webster.com/dictionary/masochism.

259 United Sates v. Lyckman, 235 F.3d 234, 238 (5th Cir. 2000), discussing United States v. Delmarle, 99 F.3d 80, 83 (2d. Cir. 1996); *Turchen*, 187 F.3d 735, 740 (7th Cir. 1999); and *Garrett*, 190 F.3d 1220, 1223–24 (11th Cir. 1999).

260 *Id.*

261 Section 2G2.2(b)(3)(B).

262 Section 2G2.2(b)(3)(D).

263 Section 2G2.2.

264 Section 2G2.2.

265 U.S. Sentencing Commission, *supra* note 43.

266 *See* 18 U.S.C. § 3509, which is used in many districts to prevent the defense from having meaningful access to the forensic data.

267 This language is copied verbatim from the text of a presentence investigation report of a client I represented. The report is not available for public consumption. although the Commissioners will have access to the information and data.

268 Basbaum, *supra* note 67, at 1298 [emphasis added].

269 *See* § 2G2.2(b)(5).

270 *See, e.g.,* Seto & Eke, *supra* note 123.

271 Section 2G2.2(b)(5).

272 Section 2G2.2 Application Note 1.

273 *See, e.g.,* § 2K2.1 (firearms), § 2D1.1 (drugs), § 2L1.2 (illegal reentry).

274 United States v. Ashley, 342 F.3d 850 (8th Cir. 2003).

275 United States v. Watts, 519 U.S. 148; 117 S. Ct. 633 (1997) (holding that defendants may be punished for acquitted conduct proven by a preponderance of the evidence).

276 *Apodaca*, 641 F.3d 1077 at 1083.

277 18 U.S.C. § 3583(k), 3553.

278 Section 5D1.2 and § 5D1.2 , Application Note 1.

279 *See, e.g.,* David Patton, *Guns, Crime Control, and a Systemic Approach to Federal Sentencing*, 32 Cardozo L. rev. 1427, 1470 (2011); *See also* a 1991 memorandum to the Sentencing Commission *available at* http://www.src-project.org/wp-content/pdfs/public-comment/ussc_publiccomment_199103/2500.pdf (p. 25 n.29) and http://www.fd.org/pdf_lib/2K2.1%20Sentmemo.pdf.

280 New York v. Ferber, 458 U.S. 747, 759, 102 S. Ct. 3348, 73 L.Ed.2d 1113 (1982); *see also* Osborne v. Ohio, 495 U.S. 103, 111, 110 S. Ct. 1691, 109 L.Ed.2d 98 (1990) ("The pornography's continued existence causes the child victims continuing harm by haunting the children for years to come.").

281 Exum, *supra* note 55, at 13.

282 *Id.* citing Audrey Rogers, *Child Pornography's Forgotten Victims*, 28 Pace L. Rev. 847, 862 (2008).

283 National Strategy, *supra* note 110.

284 United States v. Goff, 501 F.3d 250, 259 (3rd Cir. 2007).